UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
CAMBRIDGE MEDICAL, P.C.,

                                    Plaintiff,

            -against-

ALLSTATE INSURANCE COMPANY, ALLSTATE
INDEMNITY COMPANY and ALLSTATE
PROPERTY AND CASUALTY INSURANCE COMPANY
                              Defendants.
-------------------------------------------------------------------X

ALLSTATE INSURANCE COMPANY, ALLSTATE
INDEMNITY COMPANY and ALLSTATE
PROPERTY AND CASUALTY INSURANCE COMPANY,

            Defendants and Third Party Plaintiffs

            -against-

PINE HOLLOW MEDICAL, P.C.
MARK J. LEVITAN, EILEEN S. DEBBI, M.D.,
F. SCOTT NOWAKOWSKI, M.D., NICHOLAS M. JONES,
D.O., SCOTT A. JONES, D.O., ALEXANDRA PERKINS,
M.D., DOMINIC JUDE RUBINO, D.C., FRANK
MANDARINO, D.C., JASON SCOTT BRATTNER, D.C.,
RONALD MAZZA, D.C., MICHAEL A. BERSTEIN,
D.C.,JONATHAN TEPPER, D.C., WALTER MENDOZA,
D.C., BROOKLYN CHIROPRACTIC ASSOCIATES P.C.,
BRONX CHIROPRACTIC ASSOCIATES, P.C., STATEN
ISLAND CHIROPRACTIC ASSOCIATES, P.C.,
COMPLETE CHIROPRACTIC, P.C., QUEENS
CHIROPRACTIC ASSOCIATES, P.C., RONALD MAZZA,
D.C., P.C., WALTER MENDOZA CHIROPRACTOR, P.C.,
MICHAEL A. BERNSTEIN, D.C., P.C., JOHN DOES 1 and
2 and ABC CORPS. 1 and 2

                        Third Party Defendants.
-------------------------------------------------------------------X

Case No:
2:11-cv-04044-LDW-ETB

**ATTORNEY'S
AFFIRMATION IN
OPPOSITION TO
PLAINTIFF'S AND THIRD-
PARTY DEFENDANTS'
MOTION TO DISMISS**

State of New York    )
                 )ss.:
County of New York  )

       Randall K. Roonan, Esq., an attorney duly licensed to practice law before the Courts of the State of New York, affirms the following statements to be true under the penalties of perjury:

       1.      I am an Associate with the Law Offices of Short & Billy, P.C., attorneys for the Defendant and Third-party Plaintiffs ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY and ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY [hereinafter collectively referred to as "ALLSTATE"].  I submit this affirmation in opposition to the Plaintiff and Third-party Defendants' Motions to Dismiss.  I make this affirmation based upon my review of the files maintained by my office and upon information and belief.

       2.      This lawsuit involves, inter alia, ALLSTATES claims in their Answer, Counterclaims and Third-party Complaint against the Plaintiff and the moving Third-party Defendants for recovery of No-fault medical benefits paid under the Insurance Laws of New York State for fraudulent claims.

       3.      A true and accurate copy of the New York State Senate Notice of Public Hearing dated February 4, 2010, discussing "fraud and abuse of [New York's] no-fault system" is annexed hereto as Exhibit 1.

       4.      A true and accurate copy of the Department of Financial Services March 15, 2012 annual report on health care fraud the New York State Insurance department is annexed hereto as Exhibit 2.

5.     A true and accurate copy of a Department of Financial Services proposal of the Fourth Amendment to 11 NYCRR 65-3 (Insurance Regulation No. 68-C) is attached, as Exhibit 3.

6.     A true and accurate copy is attached, as Exhibit 4, of Governor Cuomo's press release dated May 1st, 2012, which regarded the proposed amendments to end no-fault fraud.

7.     A true and accurate copy of the New York State Insurance Department's Opinion Letter dated November 29, 2000 is attached as Exhibit 5.

8.     Attached, as Exhibit 6, is a true and accurate copy of the Court's decision, dated May 16, 2011, in Cambridge Medical PC. v. Allstate Ins. Co. (CV-068211/09 Civ. Ct. Cty. Of N.Y., N.Y. County)

9.     Attached, as Exhibit 7, are true and accurate copies of screen shots from www.bakesanders.com, the website of the law firm of Baker, Sanders, Barshay, Grossman, Fass, Muhlstock & Neuwirth, LLC describing the firm's practice and containing Steven J. Neuwirth, Esq.'s biography.

10.     Attached, as Exhibit 8, are true and accurate copies of the trial memorandums of law submitted in two Cambridge cases with Allstate.

11.     Attached, as Exhibit 9 are true and accurate copies of three decisions of Judge Moulton dated October 11th, 2011 and October 12th, 2011.

12.     Attached, as Exhibit 10, is a true and accurate copy of Judge Samuels' Decision in Matrangolo a/o Infuso(CV-012997-09); a/o Fanelli(CV-050716); a/o Jackson (CV-012988-09); a/o Muscara (CV-012992-09) v. Allstate (noted in her comments on page 29 of the trial transcript).

13.     Attached, as Exhibit 11, is a true and accurate copy of the decision in Dr. Stephen Matrangolo, D.C., P.C. and David Fitzhugh v Progressive Casualty Ins. Company.

14.     Attached, as Exhibit 12, are true and accurate copies of the Arbitration Awards in Optimum/Monteleone v Geico and  Optimum /Rosario v Geico and Optimum/Rosario v. Allstate.

WHEREFORE, Defendant and Third-party Plaintiffs, ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY and ALLSTATEPROPERTY AND CASUALTY INSURANCE COMPANY respectfully request that the Plaintiff and Third-party defendants' Motion to Dismiss be denied in its entirety, and such other and further relief as this Court deems just and proper.

Dated: June 20, 2012

_____
RANDALL K. ROONAN (RR4407)
SKIP SHORT (SS2788)
Short & Billy, P.C.
Attorneys for Defendant and Third-party Plaintiffs,
ALLSTATE INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY and
ALLSTATEPROPERTY AND CASUALTY
INSURANCE COMPANY
217 Broadway, Ste. 300
New York, NY 10007
(212) 732- 3320
randyr@shortandbill.com

To:     Jonathan J. Arzt, Esq.
        Blodnick, Fazio and Associates, P.C.
        1325 Franklin Avenue
        Garden City, NY 11530
        jartz@blodnickfaziolaw.com

        Kenneth C. Henry, Jr., Esq.
        KENNETH C. HENRY, JR., P.C.
        900 Merchant's Street, Ste. 303
        Westbury, N.Y. 11590
        khenry@Kenhenryesq.com

4

EXHIBIT 1

# New York State Senate

## Notice of Public Hearing



## Senate Standing Committee on Insurance

### Neil D. Breslin, Chair

**SUBJECT:** No-fault Fraud in New York State

**PURPOSE:** The purpose of this hearing is to (1) identify the fundamental causes of no-fault fraud; (2) determine why there has been an apparent increase in no-fault fraud in recent years; (3) better understand how no-fault fraud is perpetrated; and (4) to explore potential solutions to reduce the incidences of no-fault fraud in New York State.

**February 4th, 2010**

**10:00 a.m.**

**Hearing Room A**

**Legislative Office Building**

**Albany, New York**

The costs of fraud and abuse of the state's no-fault system is ultimately borne by New York's honest policyholders. During the past five years New York's auto insurers have seen a 56 percent increase in the average cost of no-fault claims, which according to many experts is the result of fraud and abuse of the no-fault system in New York. According to the Insurance Information Institute, New York's auto insurers saw their typical no-fault payment for the medical care of accident victims rise from approximately $5,615 per claim in 2004 to approximately $8,748 per claim in 2009. It is estimated that a significant percentage of each individuals automobile insurance premium can be contributed to insurance fraud.

The Committee would like to hear from representatives from government, insurance industry, and advocates.

Persons wishing to present pertinent testimony to the Committee at this public hearing should complete and return the enclosed reply form as soon as possible. *Oral testimony is by invitation only.* Fifteen copies of any prepared testimony should be submitted at the hearing registration desk. Written testimony will also be accepted and may be sent to the contact person listed on the reply form. In order to publicize the hearing further, please inform interested parties of the Committee's interest in receiving written testimony from all sources.

In order to meet the needs of those who may have a disability, the Senate, in accordance with their policy of non-discrimination on the bases of disability, as well as the 1990 Americans with Disabilities Act (ADA), has made its facilities and services available to all individuals with disabilities. For individuals with disabilities, accommodations will be provided, upon reasonable request, to afford such individuals access and admission to Senate and Assembly facilities and activities.

EXHIBIT 2



# New York State Department of Financial Services Annual Report on the Activities of the Department to Investigate and Combat Health Insurance Fraud

As required by § 409(c) of the Financial Services Law

Report to the Governor, the Comptroller, the Attorney General, the President Pro Tem of the Senate, the Speaker of the Assembly, and the Chairpersons of the Senate Finance and Health Committees and the Assembly Ways and Means and Health Committees

March 15, 2012

Benjamin M. Lawsky
Superintendent
New York State Department of Financial Services

NEW YORK STATE
# DEPARTMENT *of*
# FINANCIAL SERVICES

Andrew M. Cuomo
Governor

Benjamin M. Lawsky
Superintendent

March 15, 2012

Dear Governor Cuomo, Comptroller DiNapoli, Attorney General Schneiderman, President Pro Tem Skelos, Speaker Silver, Chairman DeFrancisco, Chairman Hannon, Chairman Farrell, and Chairman Gottfried:

On behalf of the Department of Financial Services ("the Department"), I hereby submit this report required by Section 409 (c) of the Financial Services Law summarizing the Department's activities to investigate and combat health insurance fraud.

As you will see, this report highlights the importance of fighting no-fault fraud. Reports of no-fault fraud totaled 85 percent of health insurance fraud reports and more than half of reports of fraud of all types. In sum, it is the biggest single fraud issue faced by the Department.

That is why Governor Cuomo directed the Department to launch a statewide initiative to stop deceptive doctors and shut down medical mills that plague New York's no-fault insurance payment system and cost New Yorkers hundreds of millions of dollars in insurance costs.

The Department has also sent demands for information to 135 medical providers whose billing practices have raised concerns regarding possible no-fault fraud.

This report highlights some of the major investigations undertaken during 2011, including a number of investigations conducted jointly with fellow law enforcement agencies. These investigations resulted in the arrests and prosecutions of individuals whose schemes were responsible for millions of dollars of fraudulent claims to insurance companies. Overall, investigations by the Department led to 210 arrests for health care fraud in 2011.

In the coming year, the Department and its Financial Frauds and Consumer Protection Division (FFCPD) look forward to continuing to work closely with all our partners to aggressively combat health care fraud.

Respectfully submitted,

Benjamin M. Lawsky
Superintendent of Financial Services

## Table of Contents

|  |  | Page |
|---|---|---|
| Executive Summary……………………………………….. | | 1 |
| Purpose of this Report……………………………………. | | 1 |
| 2011 Highlights ………………………………………… | | 2 |

**I. The Department's Financial Frauds and Consumer Protection Division Insurance Frauds Bureau**

| A. Merger of the Insurance and Banking Departments ……. | 3 |
| B. Health Care Fraud ……………………………………. | 3 |
| 1. Types of Health Care Fraud ………………………….. | 3 |
| 2. The Costs of Health Care Fraud ………..……………... | 4 |
| 3. No-Fault Fraud ……………………………………  . | 4 |

**II. Collaborative Efforts to Combat Health Care Fraud**

| A. Drug Enforcement Admin Tactical Diversion Task Force | 6 |
| B. Medicare Fraud Strike Force ………………………….... | 7 |
| C. Western New York Health Care Fraud Task Force …….. | 7 |
| D. Other Group Participation……………………………… | 7 |

**III. Reporting and Preventing Insurance Fraud**

| A. Insurance Company Reporting ……………………….. | 7 |
| B. Compliance with 409 of the Insurance Law ……………. | 9 |
| C. Fraud Prevention Plan Requirements …………………… | 9 |
| D. Public Awareness Programs ………………………….. | 10 |
| E. Consumer Reporting ………………………………….. | 10 |

**IV. The Year in Review**

| A. Major Cases ……………………………………….. | 10 |
| B. Continuing Education/Training ……………………..…….. | 15 |
| C. Outreach Program ……………………………………… | 16 |
| D. Insurance Frauds Bureau Offices ……………………….. | 18 |

## Graphs

| 1. Number of Suspected Fraud Reports vs. Number of Suspected No-Fault Reports – 2007-2011 ………………………….. | 5 |
| 2. Number of Suspected Health Care Fraud Reports vs. Number of Suspected No-Fault Fraud Reports -- 2007-2011  5 | |
| 3. Number of Health Care Fraud Reports Received – 2011… | 8 |
| 4. Number of Health Care Fraud Cases Opened – 2011 …… | 8 |

## EXECUTIVE SUMMARY

Through the enactment of the Financial Services Law, the Banking and Insurance Departments were merged into a single Department of Financial Services ("DFS") which began operating on October 3, 2011. The merger was proposed as a way to establish a single regulatory agency with a broad overview of the entire range of financial services, as well as to capitalize on efficiencies through government restructuring. To that end, DFS is tasked with consolidating regulatory and non-regulatory functions and working to identify ways to become a more efficient and effective regulator.  The Financial Services Law created a new Financial Frauds and Consumer Protection Division, which includes the Insurance Frauds Bureau of the former Insurance Department.

This report, required under Section 409(c) of the Financial Services Law, summarizes the activities of the Department in combating health insurance fraud during 2011.

## PURPOSE OF THIS REPORT

Fin. Serv. L. § 409(c) provides:

> No later than March fifteenth of each year, beginning in two thousand twelve, the superintendent shall furnish to the governor, the state comptroller, the attorney general, the temporary president of the senate, the speaker of the assembly, the chairpersons of the senate finance and health committees, and the assembly ways and means and health committees, a report summarizing the department's activities to investigate and combat health insurance fraud including information regarding referrals received, investigations initiated, investigations completed, and any other material necessary or desirable to evaluate the department's efforts.

**Health Care Fraud**
**2011 Highlights**

- Effective October 3, 2011, the New York State Insurance Department and the New York State Banking Department merged into a new agency – the Department of Financial Services (DFS).

- DFS's Financial Frauds and Consumer Protection Division's (FFCPD) Criminal Investigations Unit includes what was the Insurance Frauds Bureau, which had been part of the Insurance Department.

- The Department's FFCPD investigates and combats health care fraud, which includes three major types of insurance: accident and health, private disability and no-fault.

- Health care fraud investigations conducted by the Department resulted in 210 arrests, up 32 percent from the 159 arrests in 2010.

- The Department received 14,033 reports of suspected health care fraud including 1,915 involving accident and health insurance, 144 involving disability insurance and 11,974 involving no-fault.

- Reports of suspected no-fault fraud accounted for 51% of a total of 23,422 reports of all types of fraud received during the year.

- The Department's FFCPD and other members of the Drug Enforcement Administration Tactical Diversion Task Force made 47 arrests in 18 investigations.

2

I.      **Insurance Frauds and the Departmental of Financial Services**

A. **Merger of the Insurance and Banking Departments**

Governor Andrew Cuomo announced his plan to create the Department of Financial Services (DFS) by merging the New York State Insurance Department and the New York State Banking Department in his 2011 State of the State address.  The new Department is designed to better regulate modern financial services organizations. By combining the Insurance and Banking Departments into a unified financial regulator, the new Department of Financial Services will be a more efficient, modern, and comprehensive regulator of the financial sector.



Superintendent of Financial Services Benjamin M. Lawsky set the mission and announced the structure for the Department. He summarized the three main goals of the DFS to be "keeping New York on the cutting edge as the financial capital of the world, protecting consumers better than ever before, and serving as a model of efficient government." Superintendent Lawsky described the structure of the new Department's five main divisions: The Insurance Division; the Banking Division; the Financial Frauds and Consumer Protection Division; the Real Estate Division; and the Capital Markets Division.

The Department's new Financial Frauds and Consumer Protection Division is headquartered in New York City, with an office in Mineola and five offices across the upstate region: Albany, Syracuse, Rochester, Buffalo and Oneonta. The Department has a longstanding commitment to combating insurance fraud. That commitment will continue and the Department will strive to serve the people of New York State with dedication, professionalism and distinction.

B. **Health Care Fraud[1]**

The Department investigates insurance fraud, including health care fraud, throughout New York State. Health care fraud involves three major types of insurance: accident and health, private disability and no-fault.

1. **Types of Health Care Fraud**

Department investigators work closely with the insurance industry and law enforcement agencies on the federal, state and local levels to combat health care fraud schemes. Such schemes increase insurance premiums for all consumers.

---

[1] The other areas of insurance fraud that the Department investigates are discussed in a separate report entitled "The New York State Department of Financial Services Report on the Activities of the Financial Frauds and Consumer Protection Division" as required by Section 409(b) of the Financial Services Law.

The following are some of the more common types of health care fraud.

- Pharmaceutical fraud;
- Billing for services that were never rendered;
- Billing for more expensive procedures than were actually provided, commonly known as upcoding;
- Performing medically unnecessary treatments and expensive diagnostic tests for the purpose of generating insurance payments;
- Misrepresenting non-covered treatments as medically necessary covered treatments, e.g., cosmetic nose surgery billed as deviated septum repairs;
- Unbundling, i.e., billing as if each step of a procedure were a separate procedure;
- Staging/causing auto accidents;
- Filing no-fault claims for nonexistent injuries;
- Filing false or exaggerated medical disability claims;
- Staging fake slip-and-fall accidents; and
- Accepting kickbacks for patient referrals.

A review of health care fraud reports received by the Department in 2011 showed a year-to-year increase in allegations of pharmaceutical fraud and/or diversion of controlled substances, as did the incidence of medically unnecessary treatments and expensive diagnostic tests. Reports of other types of health care fraud, such as upcoding, billing for services not provided and filing no-fault claims for nonexistent injuries, while abundant, remained steady during 2011.

## 2. The Costs of Health Care Fraud

Health care fraud is a costly and pervasive drain on the national health care system. Though experts vary in their estimates, all agree that the costs of health care fraud are exorbitant. According to the National Health Care Anti-Fraud Association (NHCAA), fraud wastes at least 3 percent of all health care spending each year and may waste as much as 10 percent. The NHCAA estimates that the financial losses due to health care fraud are in the tens of billions of dollars annually. Combating fraud and abuse helps rein in the escalating costs of health care in the United States.

## 3. No-Fault Fraud

The number of suspected no-fault fraud reports received by the Department began to rise in 2007 and there were small year-to-year increases through 2009. Such reports declined in both 2010 and 2011, totaling 11,974 in the most recent year reported. In 2011, suspected no-fault fraud reports accounted for 51% of all fraud reports received by the Bureau.

The number of suspected no-fault fraud reports made up 85% of all health care fraud reports in 2011 and have accounted for upwards of 85% of total health care fraud reports since at least 2007.

4

Graph 1



Graph 2



New Yorkers pay 53% more than the national average for auto insurance premiums, making the State the fourth most expensive for such costs. Combating no-fault fraud is an essential component in mitigating these significant costs, and the Department is committed to rooting out and preventing no-fault fraud and all other types of health insurance fraud.

The Department will continue to take an aggressive proactive approach with regard to its efforts to combat no-fault insurance fraud. No-fault fraud is often perpetrated by complex

5

enterprises that consist of corrupt medical providers and attorneys. Earlier this month, Governor Cuomo announced a statewide initiative to stop deceptive medical providers and shut down medical mills that plague New York's no-fault insurance payment system and cost New Yorkers hundreds of millions of dollars in insurance costs. The initiative has two parts: 1) the Department issued a new regulation that will enable it to ban medical providers who engage in fraudulent and deceptive practices as part of the no-fault system. The regulation implements a 2005 law that gives DFS the power to regulate medical provider participation in the no-fault system, and 2) as part of an ongoing investigation, the Department is sending letters to 135 medical providers, identified through audits as well as information from law enforcement and insurance companies, whose billing practices have raised concerns regarding possible no-fault fraud and demanding information regarding their corporate structures, payment requests, and their direct participation in the practice. Any provider who refuses to respond to the Department's letters may be banned from participating in the no-fault system.

## II.    Collaborative Efforts to Combat Health Care Fraud

The FFCPD's Insurance Frauds Bureau is a member of several task forces and working groups designed to foster cooperation and communication among the many law enforcement agencies involved in combating health care fraud. Participation provides the opportunity to plan joint investigations, share information and hone investigative skills. To that end, several of the Bureau's investigators have been assigned to these groups and partner with other members in investigating cases involving health care fraud. Among the groups of which the Bureau is a member are the following:

- Western New York Health Care Fraud Task Force
- Central New York Health Care Fraud Working Group
- FBI/U.S. Attorney Health Care Fraud Working Group
- FBI New York Health Care Fraud Task Force
- National Insurance Crime Bureau Medical Working Groups
- Medicare Fraud Strike Force
- Drug Enforcement Administration Tactical Diversion Task Force (Upstate/Downstate)

## A. Drug Enforcement Administration Tactical Diversion Task Force

The FFCPD's Insurance Frauds Bureau has been a member of the Albany-based Drug Enforcement Administration Tactical Diversion Task Force (UTDTF) since February 2011 when an investigator was assigned to work side-by-side with the Task Force's other members. The Task Force investigates organized drug diversion schemes, "doctor shopping" and forgery of controlled substance prescriptions. The Task Force made 47 arrests as a result of the successful investigation of 18 cases in 2011. Due to the success of the UTDTF, Frauds Bureau recently joined a similar task force in the downstate area that is focused on the same problem.

**B. Medicare Fraud Strike Force**

The Medicare Fraud Strike Force, coordinated jointly by the Department of Justice and the Department of Health and Human Services, is a multi-agency team of federal, state and local law enforcement agencies that combats fraud by analyzing data and putting an increased focus on community policing. The Strike Force is part of the Health Care Fraud Prevention and Enforcement Action Team (HEAT), created in May 2009 to prevent and deter fraud and enforce current anti-fraud laws.

Since the inception of operations in March 2007, Strike Force operations in nine cities, including New York, have charged more than 1,140 defendants who collectively fraudulently billed the Medicare program for more than $2.9 billion. Moreover, the HHS Centers for Medicare and Medicaid Services, working in conjunction with its Office of the Inspector General, are taking steps to increase accountability and decrease the presence of fraudulent providers.

**C. Western New York Health Care Fraud Task Force**

The Western New York Health Care Fraud Task Force works closely with state and local law enforcement agencies and the insurance industry to combat widespread fraud in the health care industry. In addition to the FFCPD's Insurance Frauds Bureau, Task Force members include the FBI, the U.S. Department of Health and Human Services' Office of the Inspector General, the IRS, and the U.S. Postal Service, among others. Investigations by the Task Force led to convictions and sentencing in two cases in 2011. In one case, a Buffalo podiatrist was sentenced to six months in federal prison, one year of supervised release and restitution of $36,869 after pleading guilty to one count of theft in connection with health care fraud. In the second case, an Orleans County pediatrician was sentenced to five years' probation, 200 hours of community service and $260,877 in restitution. He received free vaccines meant for Medicaid patients, dispensed them to non-Medicaid patients and billed their private insurers. Both cases are summarized in Section IV. A of this Report.

**D. Other Group Participation**

The Bureau also actively participates in the FBI New York Health Care Fraud Task Force, the National Insurance Crime Bureau Medical Working Group and the Central New York Health Care Fraud Working Group. Participation provides the opportunity for studying trends, planning strategies and conducting joint investigations.

**III.    Reporting and Preventing Insurance Fraud**

**A. Insurance Company Reporting**

Insurers are required by Section 405 of the Insurance Law to report suspected fraud to the Department. The Department has a Web-based Case Management System, known as FCMS, that allows insurers to submit reports of suspected fraud electronically. The system has been fully operational since the first quarter of 2007. In 2011, approximately 93 percent of the 23,422 fraud

reports received by the Department were transmitted electronically and received remotely from insurers. Insurers have access to FCMS through the Department's portal using secure accounts.

The Department received 14,033 reports of suspected health care fraud during 2011 – 1,915 involving accident and health insurance, 144 involving disability insurance and 11,974 involving no-fault. A total of 173 new health care fraud cases were opened for investigation. Of these, 72 involved accident and health, 13 involved disability and 88 involved no-fault. In contrast, of a total 170 new health care fraud cases opened in the prior year, 72 involved no-fault. (It should be noted that frequently multiple fraud reports can be linked to one case.) At the same time, investigations continued in numerous cases that were opened in prior years. Health care fraud investigations by the Department resulted in 210 arrests in 2011 compared to 159 arrests in 2010 - an increase of 32%.

**Graph 3**



**Graph 4**



## B. Consumer Reporting

Consumers are encouraged to report suspected fraud to the Department. The Bureau maintains a toll-free hotline to facilitate reporting. Once a report is received, an investigator will contact the caller for details maintained on a confidential basis. The Department recorded an average of 21 calls per week during 2011. The "Consumers" section on the Department's website also includes a link to a fraud report form and instructions for consumers to report fraud to the Department by mail or fax. The section is designed to help consumers recognize, report and combat insurance fraud.

## IV.   The Year in Review

## A.  Major Cases in 2011

Numerous health care fraud investigations were conducted during the past year. Some of these cases are summarized below.

- **No Treatment:** In February, a Manhattan podiatrist was charged with stealing more than $100,000 from a health insurer by submitting claims for treatment that never occurred and asking patients to lie to investigators. He is accused of using patient information of at least five persons to submit claims to CIGNA Insurance Company. In two instances, the defendant allegedly accepted payment for claims he filed on behalf of patients, one of whom was in Europe and the other at Disney World when the treatment purportedly was provided. CIGNA paid out a total of $100,671 on the fraudulent claims. An investigation by the Department led to the arrest.

- **Probation and Restitution:** In March, an upstate resident was sentenced to three years' probation and ordered to pay $33,000 in restitution. Following an auto accident, he received prescriptions for medications through his no-fault insurance coverage. He submitted the receipts to Selective Insurance Company for reimbursement with an altered bill indicating that he had paid the entire cost of the medications. An investigation uncovered evidence that Medicaid had paid for the prescriptions, with the exception of his co-payments that ranged from $.50 to $6, the only out-of-pocket expenses the defendant incurred.

- **Forged Prescriptions:** An investigation resulted in the arrest in March of a registered nurse in Nassau County for insurance fraud. The defendant had 17 prescriptions for controlled substances filled at various local pharmacies under her health insurance plan. Records from three of the pharmacies showed that the defendant had picked up the prescriptions. Numerous physicians purportedly wrote the prescriptions, however, the physicians in question informed investigators that the prescriptions were forged. As a result of the fraud, the defendant's insurance plan paid the pharmacies $10,679 for forged prescriptions.

- **Fraudulent Billing:** A Yonkers medical billing clerk was employed by a doctor who also treated her as a patient. The investigation found that, during the first half of 2008, the

9

clerk had submitted 20 claims totaling $52,200 for services that were not provided to her and for visits that never took place. As a result, Nippon Life Insurance Company paid out $28,326 on the fraudulent claims. The clerk was arrested in June on a charge of insurance fraud.

- **Phony Claims:** A pharmacist and his roommate were arrested in July and charged with insurance fraud as a result of an investigation. The pharmacist allegedly used the computer system at the Brooklyn drug store where he was employed to generate phony claims in the name of his roommate as if actual prescriptions had been written and filled. The roommate then submitted the phony claims to Medco Health Solutions, a pharmacy benefits management program, and obtained reimbursements of more than $1 million.

- **Unqualified Participants:** A New York-licensed broker was charged with enrolling small business owners in Healthy New York, a state-sponsored health insurance plan, which they were not qualified to participate in. The broker allegedly helped the small business owners file applications to MVP Healthcare and charged them fees ranging from $250 to $1,000. The fraudulently obtained coverage resulted in MVP's payment of an estimated $491,000 in medical and prescription drug claims and $7,800 in commissions to the broker. The broker was arrested in July as a result of the investigation.

- **Stolen Prescription Pads:** A fourth suspect was charged with health care fraud in a continuing investigation led by the Department with the assistance of the U.S. Department of Health and Human Services' Office of the Inspector General. Evidence indicated that the suspect had stolen prescription pads from medical facilities, sold some of the pads and filled prescriptions for controlled substances with the remaining pads. He then sold the medications he had obtained illegally. A search warrant executed at his Bronx residence in September led to his arrest. Three other suspects in the case had previously been arrested in connection with a scheme to steal blank prescription pads, write prescriptions for controlled substances (*i.e.*, oxycodone), and have them filled. Search warrants were executed at the residences of those suspects in August based on evidence gathered during the investigation. The suspects were arrested in August and September for allegedly running a fraudulent prescription drug ring from their homes.

- **Claims-Handling Complaint:** A New York City man was arrested in September and charged with filing nine fraudulent claims for $22,570 with Aetna Insurance Company for medical treatment he allegedly had not received. The investigation disclosed that a doctor who the man claimed had performed medical services in January 2010 had died in August 2009. Several other claims indicated treatment by another doctor at NYU Langone emergency room but investigators found that there was no such doctor associated with NYU and the State Education Department Office of the Professions had no record of a health care provider with the name provided on the suspect's claims. After filing the claims and before the investigation was initiated, the suspect wrote to the Superintendent of Insurance twice and spoke with him on one occasion to complain about Aetna's handling of his claims. Aetna paid $11,256 on the nine claims.

- **Upcoding:** After pleading guilty to federal health care fraud in May, a chiropractor was sentenced in November to five years' probation and was ordered to pay $199,999 in restitution to Excellus BlueCross BlueShield. From 2005 through 2009, he submitted more than $200,000 in fraudulent claims to Excellus. In numerous instances he provided routine services but submitted claims for more expensive treatments, a practice known as upcoding. In other instances, he billed for services that he never provided and for visits that never occurred. His arrest was the result of an investigation conducted by Department investigators and the FBI.

- **Participation for Members Only:** A senior official of the Otsego County Chamber of Commerce was arrested for his participation in a fraudulent health insurance scheme. He enrolled New York City residents in the Chamber's health plan by maintaining that they were Chamber members and offering them lower rates than they would have paid for coverage in the New York City area. He enrolled other individuals outside of Otsego County in the Chamber's legitimate health plan after creating a nonexistent "associate member" designation for them. The enrollees were unaware that they had been fraudulently listed as Chamber members. The Department began its investigation after being contacted by MVP Health Care, which had noticed an unusual spike in new enrollments with many enrollees residing outside of Otsego County. After the scheme was discovered, the 400 New York City enrollees and 120 legitimate Otsego County enrollees lost their coverage. Coverage for the Otsego County enrollees subsequently was reinstated under a new plan. MVP lost more than $135,000 in premiums, and paid more than $654,000 in claims for medical treatments, plus $285,000 for prescription drugs for the fraudulently enrolled members.

- **Operation Eye In The Sky:** Three drivers and five passengers were arrested in March for staging an accident in the Bronx in June 2010 and subsequently filing no-fault claims for nonexistent injuries. A video surveillance camera caught them circling the block and then setting up the three-car collision. After assessing the damage, the drivers returned to their cars and repeated the "accident" to cause more damage. They were treated for their alleged injuries at local Bronx medical clinics that billed insurers up to $39,000. The three men told investigators that one of them stopped short, leaving no time for the other two to avoid hitting the stopped car. Evidence gathered during an investigation by the Department and the NYPD's Fraudulent Accident Investigations Squad indicated that the eight defendants were friends prior to the accident.

- **Prescribed For Herself:** A Rochester pharmacist was accused of prescribing medications for herself by calling prescriptions in to local pharmacies using the Drug Enforcement Administration numbers of two doctors, one of whom was her former husband. The prescriptions were then submitted electronically to Excellus Health Plan which paid out $1,200 in reimbursements for the illegally prescribed drugs. The Rochester Office of the FBI requested the assistance of the Department in the investigation that led to the pharmacist's arrest in March.

- **Illegally Obtained Medications:** In March, agents from the FBI and the IRS asked the Department for assistance in an investigation that revealed that a Rochester attorney was

11

receiving large quantities of prescription pain killers from a local doctor, although his medical records did not support the need for those medications. Over a five-year period, Excellus Health Plan paid out $398,793 for the illegally obtained medications. Following a sealed federal grand jury indictment, a warrant was issued and the attorney was arrested in May and charged with health care fraud and related crimes.

- **Videotape Evidence:** A Bronx man who filed a no-fault application in September 2010 subsequently sought and received medical treatment for purported injuries. A review of a videotape of the accident scene, however, showed that the defendant was not involved in the accident and was not in proximity to any of the vehicles involved in the accident.  As a result of the fraud, Liberty Mutual Insurance Company was billed more than $20,000 for unnecessary medical treatment. Department investigators and the NYPD's Fraudulent Accident Investigations Squad conducted the investigation that led to the man's arrest in April.

- **Federal Prison Sentence and Restitution:** After pleading guilty to one misdemeanor count of theft in connection with health care fraud in January, a Buffalo podiatrist was sentenced in May to six months in federal prison and one year of supervised release, and was ordered to pay restitution of $36,070 to Medicare and $799 to Univera Healthcare. He had been charged with 28 counts of health care fraud in January 2009 and subsequently admitted that in April 2005 he submitted a claim to Medicare falsely stating that he had performed a procedure called a "wedge excision." He was originally charged with repeatedly billing Medicare and private insurers for expensive treatments when he was actually providing only routine foot care. The investigation that led to his arrest was conducted by the Western New York Health Care Fraud Task Force, of which the FFCPD's Frauds Bureau is a member.

- **Sting Operation Nets "Runner":** As a result of an undercover sting operation conducted by the Department and the Suffolk County Insurance Crime Bureau, a known "runner" was arrested in May and charged with computer trespass. The defendant allegedly paid two employees at a hospital in Bay Shore for patient file information. He then contacted the patients and steered them to specific attorneys and medical clinics in an insurance fraud scheme. The two hospital employees were arrested in February and also charged with computer trespass.

- **Podiatrist Sentenced:** After pleading guilty to grand larceny in March, an Orleans County pediatrician was sentenced in August to five years' probation and 200 hours of community service, and was ordered to pay $260,877 in restitution ($81,544 to insurers and $179,333 to Medicaid). He had received free vaccines that were supposed to be dispensed to Medicaid patients; however, he used the vaccines for non-Medicaid patients and billed their private insurers. The investigation was conducted by the Western New York Health Care Fraud Task Force, of which the FFCPD's Insurance Frauds Bureau is a member.

- **No-Fault Fraud:** Twelve suspects were indicted for participating in a no-fault scheme. The indictment charged that they staged auto accidents to generate fraudulent billing for

unnecessary medical treatments and coached legitimate accident victims to exaggerate injuries. The suspects were accused of defrauding numerous insurers of more than $45,000. The Department, the NYPD's Fraudulent Accident Investigations Squad, the Queens DA's Office and the SIUs of Progressive, GEICO and Safeco Insurance Companies collaborated on the investigation that led to the arrests.

- **No-Fault Fraud Mill:** Twenty-four defendants were charged with health care fraud for their participation in billing scams that defrauded insurers, Medicare and Medicaid out of millions of dollars. Twenty-two of the defendants were accused of causing no-fault insurers to pay out millions in reimbursements for medical treatment that was never provided or that was medically unnecessary. Two indictments charged doctors who allegedly faked ownership of medical clinics and concealed the fact that the true owners were not medical professionals. These "front" doctors, other health care providers and clinic employees caused fraudulent bills to be submitted to insurers. Charges were also brought against "runners" who were paid to recruit patients and patients who faked and exaggerated injuries from auto accidents. The patients allegedly were coached by clinic employees on how to describe their purported injuries to insurance companies.  Another indictment named two operators of a medical supply company for allegedly forging doctors' signatures and prescriptions to support fraudulent billing to Medicare and Medicaid for durable medical equipment. The defendants each face a maximum sentence of 20 years in prison. Six search warrants were executed and ten accounts were frozen in connection with the investigation, which was conducted jointly by the Department, the Office of the U.S. Attorney for the Southern District, the FBI, the NYPD and U.S. Department of Health and Human Services.

- **Two Sentenced for Health Care Fraud:** An investigation by the Department investigators together with the FBI culminated in jail sentences and orders to pay restitution for two defendants for their parts in a scheme to defraud numerous medical insurance providers by submitting fraudulent claims.  One woman was sentenced to six months and ordered to pay $247,391 after having been arrested in 2003 and subsequently pleading guilty to one count of health care fraud. Her co-defendant in the scheme, who billed massages as physical therapy and billed for services not provided, was sentenced to 30 months and ordered to pay $2.6 million. She had been arrested in 2003 and subsequently pled guilty to health care fraud and obstruction of justice.

- **60th Defendant Arrested:** An ongoing investigation into no-fault fraud led to the arrest of a Brooklyn man charged with larceny. He intentionally had crashed his vehicle into a bicycle to defraud Progressive Insurance Company. The defendant falsely reported the "accident" to Progressive, was treated for nonexistent injuries, and Progressive paid out more than $2,000 for unnecessary medical treatment. The man is the 60th defendant to be arrested in connection with this long-term investigation conducted by the Department and the NYPD's Fraudulent Accident Investigations Squad.

- **Services Not Rendered:** A joint investigation conducted by the Department and the New York State Office of Medicaid Fraud led to the November arrest of a Rochester optometrist for allegedly billing for services that he did not provide. The optometrist

fraudulently obtained $36,752 from Excellus Health Plan and $3,946 from Medicaid. Investigators learned that he was a salaried employee at an eye-care center who was not authorized to submit bills to insurers. When interviewed, the defendant confessed to submitting the fraudulent claims.

- **Fraudulent Claims:** A Long Island business owner purchased a health plan from Oxford Insurance Company for himself and his sister, who was listed on documents submitted to Oxford as an employee of her brother's company. Oxford paid $130,000 in medical bills for the sister; however, the sister admitted that she was not an employee when she was interviewed by the investigations from the Department and the Suffolk County DA's Office. The business owner was arrested and charged with insurance fraud.

## B. Continuing Education/Training

The Department's investigative staff members routinely attend career development seminars and training programs to increase their proficiency in investigative procedures, use of Department/industry/law enforcement databases as investigative tools, and problem-solving techniques in order to stay current with emerging developments in the area of health insurance fraud.

During 2011, Bureau staff took advantage of many of the educational opportunities offered by the New York Anti-Car Theft and Fraud Association, the New York Prosecutors Training Institute and the New York State Division of Criminal Justice Services, among others.

## C. Outreach Program

The Training Officer of the FFCPD's Frauds Buireau and other members of the investigative staff provided training for local police and fire units, prosecutors, insurers and community groups throughout the year. The Bureau provided training to 31 groups that included 2,388 participants during 2011, as detailed in the following table:

**Insurance Frauds Bureau**
**2011 Outreach Program**
**Insurers, Law Enforcement and Community Groups**

| Date | Group | Location | Number of Attendees |
|---|---|---|---|
| 01/20/11 | Office for the Aging (Caseworkers) | Hauppauge, NY | 23 |
| 01/28/11 | NYS Office of Fire Prevention & Control | Montour Falls, NY | 12 |
| 02/24/11 | Albany Police Department (Auto Unit) | Albany, NY | 30 |
| 03/03/11 | Preferred Mutual Insurance Company | New Berlin, NY | 16 |
| 03/09/11 | Nassau Cty. Dept. of Sr. Citizen Affairs | Merrick, NY | 35 |
| 03/14/11 | NYS Office of Fire Prevention & Control | Montour Falls, NY | 25 |
| 03/22/11 | Delaware Cty. Dept. of Emergency Svcs. (Fire Investigation Unit) | Delhi, NY | 15 |
| 04/08/11 | Co-op City Senior Center | Bronx, NY | 50 |
| 04/26/11 | NAIC International Fellows Program (Fellow) | New York, NY | 1 |
| 04/28/11 | NYS Special Investigations Unit | Saratoga, NY | 100 |
| 05/06/11 | Westchester County Police Academy (Recruits) | Valhalla, NY | 68 |
| 05/05/11 | NYS Assn. of Self-Insured Counties | Saratoga, NY | 50 |
| 05/05/11 | NY Prosecutor's Training Institute | Brooklyn, NY | 100 |
| 05/06/11 | Westchester County Police Academy (Recruits) | Valhalla, NY | 15 |
| 05/11/11 | Broome County Bank Security Officers | Binghamton, NY | 9 |
| 06/04/11 | Port Washington Senior Center | Port Washington, NY | 26 |
| 06/06/11 | New York State Insurance Department | New York, NY | 28 |
| 06/13/11 | NYS Office of Fire Prevention & Control | Montour Falls, NY | 20 |
| 06/22/11 | Liberty Mutual Insurance Company | Syracuse, NY | 38 |
| 06/24/11 | Delegation from Thailand | New York, NY | 4 |
| 07/14/11 | Port Washington Senior Center | Port Washington, NY | 9 |
| 07/21/11 | CCNS Bayside Senior Center | Bayside, NY | 70 |
| 07/26/11 | McNeil and Company | Cortland, NY | 15 |
| 08/17/11 | Hereford Insurance Company | Long Island City, NY | 101 |
| 08/25/11 | Young Israel of Midwood Senior Center | Brooklyn, NY | 30 |
| 09/14/11 | NYSID Examiner Trainees | New York, NY | 27 |
| 12/08/11 | Westchester County Police Academy (Recruits) | Valhalla, NY | 31 |
| 12/13/11 | NYPD Police Academy (Recruits) | New York, NY | 640 |
| 12/15/11 | NYPD Police Academy (Recruits) | New York, NY | 240 |
| 12/19/11 | NYPD Police Academy (Recruits) | New York, NY | 200 |
| 12/21/11 | NYPD Police Academy (Recruits) | New York, NY | 360 |
| **TOTALS** | **GROUPS 31** | **PARTICIPANTS** | **2,388** |

15

**D.  Insurance Frauds Bureau Offices**

**NEW YORK OFFICE**
25 Beaver Street
Suite 542
New York, NY  10004
(212) 480-6074
Fax # (212) 480-6066

-----------------------------------------------------------------

**MINEOLA OFFICE**
163 Mineola Blvd.
Mineola, NY 11501
(516) 248-5770
Fax # (516) 248-5727

-----------------------------------------------------------------

**ALBANY OFFICE**
One Commerce Plaza
Albany, NY  12257
(518) 473-0833
Fax # (518) 473-0369

-----------------------------------------------------------------

**BUFFALO OFFICE**
Walter J. Mahoney State Office Bldg.
65 Court Street - Room 7
Buffalo, NY  14202
(716) 847-7622
Fax # (716) 847-7925

-----------------------------------------------------------------

**ROCHESTER OFFICE**
189 North Water Street
Rochester, NY  14604
(585) 325-1681
Fax # (585) 325-6746

-----------------------------------------------------------------

**SYRACUSE OFFICE**
620 Erie Blvd., West
Suite 105
Syracuse, NY  13204
(315) 423-1248
Fax # (315) 423-3742

-----------------------------------------------------------------

**ONEONTA OFFICE**
Homer Folks Facility
28 Hill Street, Room 210
Oneonta, NY 13820
(607) 433-3628
Fax # (607) 433-3623

16

EXHIBIT 3

**NEW YORK STATE
DEPARTMENT OF FINANCIAL SERVICES**

**PROPOSED
FOURTH AMENDMENT TO 11 NYCRR 65-3
(INSURANCE REGULATION No. 68-C)**

**CLAIMS FOR PERSONAL INJURY PROTECTION BENEFITS**

I, Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, pursuant to the authority granted by Sections 202 and 302 of the Financial Services Law, Sections 301, 2601, 5221 and Article 51 of the Insurance Law, and Section 2407 of the Vehicle and Traffic Law, do hereby promulgate the following Fourth Amendment to Subpart 65-3 of Title 11 of the Official Compilation of Codes, Rules and Regulations of the State of New York (Insurance Regulation No. 68-C), to take effect upon publication in the State Register, to read as follows:

(NEW MATTER IS UNDERSCORED; MATTER IN BRACKETS IS DELETED)

New subdivisions (o) and (p) are added to section 65-3.5 to read as follows:

(o) An applicant from whom verification is requested shall, within 120 calendar days from the date of the initial request for verification, submit all such verification under the applicant's control or possession or written proof providing reasonable justification for the failure to comply. The insurer shall advise the applicant in the verification request that the insurer may deny the claim if the applicant does not provide within 120 calendar days from the date of the initial request either all such verification under the applicant's control or possession or written proof providing reasonable justification for the failure to comply. This subdivision shall not apply to a prescribed form (NF-Form) as set forth in Appendix 13 of this Title, medical examination request, or examination under oath request.

(p) With respect to a verification request and notice, an insurer's non-substantive technical or immaterial defect or omission, as well as an insurer's failure to comply with a prescribed time frame, shall not negate an applicant's obligation to comply with the request or notice.

Paragraph (3) of section 65-3.8(b) is amended to read as follows:

(3) Except as provided in subdivision (e) of this section, an insurer shall not issue a denial of claim form (NYS Form N-F 10) prior to its receipt of verification of all of the relevant information requested pursuant to [section] sections 65-3.5 and 65-3.6 of this Subpart (e.g., medical reports, wage verification, etc.). However, an insurer may issue a denial if, more than 120 calendar days after the initial request for verification, the applicant has not submitted all such verification under the applicant's control or possession or written proof providing reasonable justification for the failure to comply, provided that the verification request so advised the applicant as required in section 65-3.5(o) of this Subpart. This subdivision shall not apply to a prescribed form (NF-Form) as set forth in Appendix 13 of this Title, medical examination request, or examination under oath request.

1

Subdivisions (g) through (j) of section 65-3.8 are relettered subdivisions (i) through (l) and new subdivisions (g) and (h) are added to read as follows:

(g) Proof of the fact and amount of loss sustained pursuant to Insurance Law section 5106(a) shall not be deemed supplied by an applicant to an insurer and no payment shall be due for such claimed services under any circumstances:

(1) when the claimed services were not provided to an injured party; or

(2) for those claimed service fees that exceed the charges permissible under the schedules prepared and established pursuant to Insurance Law sections 5108(a) and (b) for services rendered by New York medical providers.

(h) With respect to a denial of claim (NYS Form N-F 10), an insurer's non-substantive technical or immaterial defect or omission shall not affect the validity of a denial of claim.

2

EXHIBIT 4

Skip to Content

New York State | State Agencies | NYCRR | NYS Laws | Search all of NY.gov

Search DFS [Search]

Home | ABOUT US | Consumers | Banking Industry | Insurance Industry | Legal | Reports & Publications

Mission & Leadership | History | News Room | Who We Supervise | Careers with DFS | Contact Us

---

**News Room**

Banking Division
Press Archive

Insurance Division
Press Archive

**Press Release**

May 01, 2012

Contact: David Neustadt 212-709-1691

## CUOMO ADMINISTRATION EXPANDS EFFORT TO END NO-FAULT FRAUD; AIMED AT STOPPING RAPID RISE IN AUTO INSURANCE RATES

*Following push to close medical mills, new regulation will stop payments where no medical treatment is rendered and cut red tape to speed resolutions*

Benjamin M. Lawsky, Superintendent of Financial Services, today continued the Cuomo Administration's aggressive program to end no-fault auto insurance fraud with regulatory reforms that close loopholes that allow lawbreakers to exploit the system. This follows an investigation announced last month into health care providers whose participation in medical mills is essential to making fraudulent no-fault claims possible.

The new regulation tackles two issues—doctors being paid for health care they do not actually provide and some technical issues that are often used to prevent a decision on a claim or keep an otherwise faulty claim open, both of which increase costs to consumers.

The new regulation:

· Puts an end to requirements that mandate insurers pay for treatments that were never actually provided, or pay more than the established fee schedule for a given service.

· Prevents healthcare providers from ignoring requests for evidence that the treatments they are providing are medically necessary by setting a 120 day deadline to provide requested information.

· Closes the loophole that allows courts and arbitrators to force insurers to pay fraudulent claims simply because the insurer made minor paperwork errors when processing a claim.

"These reforms will ensure that New Yorkers get the proper and timely treatment for legitimate injuries that they deserve, while closing loopholes that allow criminal medical mills to scam the system and drive up insurance premiums. We can and must have a system that works effectively for those in need and protects all drivers from paying a 'Fraud Tax' imposed by criminals," Superintendent Lawsky said. "The new regulations will give insurers more time to prove fraud and prevent payment, unlike the current system that requires insurers to pay no-fault claims within 30 even when they suspect that health care services have not actually been provided."

"I applaud Governor Cuomo and Superintendent Lawsky for continuing the fight to reform New York's broken no-fault auto insurance system," said Kristina Baldwin, co-spokesperson for Fraud Costs NY and assistant vice president for Property Casualty Insurers Association of America. "If implemented, these regulatory changes will help close the glaring loopholes that allow criminals to rip off the system and control the ensuing costs which are passed on to drivers by way of higher premiums."

Ellen Melchionni, co-spokesperson for Fraud Costs NY and president of the New York Insurance Association said, "Governor Cuomo and Superintendent Lawsky demonstrated real leadership when they took the critical first step reforming New York's no-fault system by targeting unscrupulous medical providers. Now, they are continuing the fight with important and crucial reforms that will protect consumers to ensure that those truly injured in an accident receive the necessary treatment they deserve."

Gary Henning, Regional Vice President, Northeast Region American Insurance Association, said, "The American Insurance Association applauds Governor Cuomo and Superintendent Lawsky for their continuing efforts against no-fault fraud with the promulgation of these regulations. These common-sense reforms will help take costs out of the no-fault system to the benefit of New York's drivers."

Regulation 68 implements New York's no-fault automobile insurance law by establishing no-fault claims settlement procedures. The new regulatory reforms amend Regulation 68 in three ways:

    1. Prevent billing for services not rendered or billing for more than the mandated fee schedule.

The current law provides no remedy to insurers when doctors and other health care providers bill in excess of the mandated workers' compensation fee schedule or for services not actually rendered—two major issues plaguing the no-fault system.

No-fault law requires insurers to pay claims in 30 days, but often it takes longer to discover that the health care was not actually provided. Under current law, courts do not allow insurers to deny claims after the deadline based on the fact that the provider has over-billed or billed for phantom services.

This amendment provides that no payment is due where the treatments were not actually provided or to the extent that the fees charged exceeded the fee schedule. So insurers will be able to use those as grounds for denying a claim.

Consumers would greatly benefit from curbing these dishonest practices because no-fault benefits are typically subject to a $50,000 limit. Thus, when providers over-bill or bill for phantom services, the consumer's no-fault monetary limit is unjustly depleted.

2. Set a time limit for responding to verification requests and denial for untimely response.

Within 30 days of receiving a no-fault claim from a healthcare provider, the insurer must pay or deny the claim, or, within 15 days, send a request for additional information to verify the claim. Once it receives verification, the insurer has 30 more days to pay or deny the claim.

There is currently no deadline for responding to a verification request. In addition, an insurer is not allowed to deny or close a claim if it never receives the requested verification. Accordingly, some claims remain open indefinitely. Under the law, insurers must pay a very high interest rate on delayed payments, so anything that causes delays can substantially increase costs.

To solve this problem, this amendment requires the healthcare provider to provide a response within 120 days of an insurer's verification request, or provide reasonable justification why it cannot do so. If the applicant fails to do one or the other, the amendment permits an insurer to deny the claim. The amendment should thus speed claims resolution and reduce the number of claims that remain open indefinitely.

3. Prevent immaterial defects in notices from invalidating them.

Under current law, if there is a small and insignificant error in an insurer's verification request or a claim denial, the healthcare provider can seek to fight it through the courts or arbitration. The new amendment states that a technical error cannot be used to avoid responding to a verification request and does not invalidate an otherwise proper claim denial. The amendment should substantially reduce litigation and arbitration over these issues, reducing yet another obstacle to the timely resolution of no-fault claims.

This proposed draft regulation will now go through the normal rule-making process, known as the State Administrative Procedure Act ("SAPA") process. The regulation will be printed in the State Register on May 16, which will trigger the start of a 45-day period for public comment. A copy of the draft regulation can be found at **http://www.dfs.ny.gov/insurance/rproindx.htm**. Comments can be submitted to: **Hoda Nairooz**.

Accessibility    Contact Us    Disclaimer    Privacy Policy    Site Map

New York State Department of Financial Services

EXHIBIT 5



STATE OF NEW YORK
INSURANCE DEPARTMENT
25 BEAVER STREET
NEW YORK, NEW YORK  10004

November 29, 2000

Francis J. Serbaroli, Esq.
Cadwalader, Wickersham & Taft
100 Maiden Lane
New York, NY 10038

Dear Mr. Serbaroli:

This is in response to your request for an opinion from the Office of General Counsel as to whether the application of N.Y. Ins. Law §5106 (McKinney 2000), which provides that the failure of an insurer to make payment of No-Fault benefits within thirty days after proof of claim has been submitted by a claimant renders payment of the claim overdue, prohibits a subsequent civil action by an insurer for the recovery of claims previously paid in accordance with N.Y. Ins. Law §5106 (McKinney 2000), where the claimant had used fraudulent means to submit claims for No-Fault benefits and received payment for those claims.

The purpose of N.Y. Ins. Law §5106 (McKinney 2000)and its implementing regulation is simply to provide for the prompt payment of covered No-Fault expenses due a claimant.  See generally Governor's Approval Memorandum, (Feb. 13, 1973) (in Governor's Bill Jacket L. 1973, Ch. 13).  The No-Fault statute thus leaves intact all common law causes of action, such as for fraud and unjust enrichment, by covered or non-covered persons against non-covered persons.  See Liberty Mutual Ins. Co. v. United States, 490 F. Supp. 328 (E.D.N.Y. 1980).  The Court of Appeals in Montgomery v. Daniels, 38 N.Y.2d 41 (1975), detailed the history and rationale behind the No-Fault statute, and found that one of the "predicates" for the Legislature's enactment of the law was the "long delays in claim payment."  Commensurate with this intent, Section 5106 provides the statutory framework for the prompt processing of claims under the No-Fault reparations system.  However, the fact of payment of a claim in no way serves to legitimize such claim in a final manner where there is "no reason to deny the No-Fault claim at the time payment is due [pursuant to Section 5106(a)]".  Dermatossian v. New York City Transit Authority, 67 N.Y.2d 219, Court of Appeals (1986).

2016-05-09 16:07                                    >> 12127323326            P 3/3

2

The New York No-Fault reparations law, more specifically through the payment of
benefits provisions of N.Y. Ins. Law §5106 (McKinney 2000), is in no way intended and
should not serve as a bar to subsequent actions by an insurer for the recovery of
fraudulently obtained benefits from a claimant, where such action is authorized under the
auspices of any other statute or under common law.  There is nothing in the legislative
history or case law interpretations of the statute or in Insurance Department regulations,
opinions or interpretations of the statute that supports the argument that the statute bars
such actions.

The payment of fraudulently obtained No-Fault benefits, without available recourse,
serves to undermine and damage the integrity of the No-Fault system, which was
created as a social reparations system for the benefit of consumers.  See Governor's
Approval Memorandum (Feb. 13, 1973) (in Governor's Bill Jacket L. 1973, Ch. 13)
(stating that the enactment of the No-Fault law created "a new insurance reparations
system which...provides substantial premium savings to [the public]").  To conclude that
the No-Fault statute bars the availability of other legal remedies, where the payment of
benefits were secured through fraudulent means, renders the public as the ultimate
victim of such fraud, in the form of higher premiums based upon the resultant increased
costs arising from the fraudulent actions.  The legislative enactment of Article 4 of the
Insurance Law, more particularly through Section 409 of that article, was intended to
prevent insurance fraud, and clearly evinces the important public policy interest in the
prevention of insurance fraud for the protection of consumers in New York.  See
Governor's Approval Memorandum, New York State Legislative Annual - 1996, p. 460
(stating that the statute would provide relief to consumers by "attacking fraud whenever it
occurs, and by whomever it is perpetrated."); Fafinski v. Reliance Ins. Co., 65 N.Y. 2d
990, 992 Court of Appeals (1985) stating that the legislative purposes in enacting the No-
Fault law were to deny coverage for losses resulting from violations of law and to keep
premiums low).

I trust this is responsive to the question you raised.

Very truly yours,

Lawrence M. Fuchsberg
Supervising Attorney

EXHIBIT 6

Civil Court of the City of New York          Index Numbers: CV-068221/09, CV-048277/09
County of Kings
          Part __65__

CAMBRIDGE MEDICAL PC,                              AMENDED DECISION/ORDER
A AO VERONICA PADUANO                              FOR NON-JURY TRIAL

                              Plaintiff,
                                                          Present:
          -against-                                HON. CAROLYN E. WADE

ALLSTATE INSURANCE COMPANY

                              Defendant

This Court's Decision/Order, dated May 16, 2011, which in the last paragraph, awarded Plaintiff, Judgments, for the above-referenced index numbers, is hereby rescinded and replaced by the following:

The above two (2) actions were consolidated by stipulation under index number: CV-068221/09 at the commencement of the trial held on March 1, 2011. The court granted leave for both sides to submit additional documents. A copy of the sub-lease and the service agreement was admitted into evidence. It was agreed that the court's ruling with respect to the instant suit for $1,196.08, comprised of two bills, would apply to both actions.

The sole issue to be determined is whether the referral to CAMBRIDGE MEDICAL, PC ("Plaintiff") for Diagnostic Tests violates Public Health Law §238-a.

Public Health Law §238-a(1) reads, in pertinent part, as follows:

> A practitioner authorized to order [...] x-ray or imaging services may not make a referral for such services to a health care provider [...] where such practitioner [...] has a financial relationship with such health care provider.

Under §§ 238(3) and 13(g), "Financial relationship" is defined as an ownership interest, investment interest or compensation arrangement; and "X-ray or imaging services" shall mean diagnostic imaging techniques, which shall include but not be limited to Ultrasonography. Ultrasound is the subject of the referral herein.

This statute does not cover the following (§238-a(5)(b)(1)):

payments made for the rental or lease of office space, if (A) there is a written agreement, signed by the parties, for the rental or lease of the space, which agreement specifies the spaced covered by the agreement [...] provides for a term of rental or lease of at least one year, provides for a payment on a periodic basis of an amount that is consistent with fair market value, provides for an amount of aggregate payments that does not vary, directly or indirectly, based on the volume of value of any referrals of business between the parties, and would be considered to be commercially reasonable even if no were referrals were made between the parties.

A review of the EBT transcript of Dr. Eileen S. Dehhi, dated 9/10/09, reveals that she is the President and CEO of Cambridge Medical, P.C., and that all of the ultrasound and EMG tests are administered at the satellite offices located throughout the seven counties. There are at least forty to forty-five medical providers. All of the diagnostic tests that Cambridge provided, are administered in the office of the referring providers. For each satellite office, Cambridge has a lease agreement ranging in the amount of $200-$600. In addition, Dr. Dehhi testified that there is a service agreement for extra charges for the use of the copy machine, fax machine, secretarial staff, scheduling, rescheduling, canceling patients, janitorial services, etc. This is a fix amount every month.

After extensive review of all the exhibits submitted; specifically, the service agreement, it is the court's opinion that the above activity violates Public Health Law § 238-a(1).

Accordingly, based upon the above, index numbers: 068221/09 and 048227/09, are dismissed.

This shall be the Decision and Order of the court.

_____
**Date**

_____
**HON. CAROLYN E. WADE**
**Judge, Civil Court**

**Civil Court of the City of New York**
**County of Kings**

Part __65__

Index Numbers: CV-068221/09, CV-048277/09

24922

MAY 2 0 2011

SHORT & BILLY, P.C.

---

CAMBRIDGE MEDICAL PC,
AAO VERONICA PADUANO

                                    Plaintiff,

            -against-

ALLSTATE INSURANCE COMPANY

                                    Defendant

**DECISION/ORDER**
**FOR NON-JURY TRIAL**

**Present:**
**HON. CAROLYN E. WADE**

---

The above two (2) actions were consolidated by stipulation under index number: CV-068221/09 at the commencement of the trial held on March 1, 2011. The court granted leave for both sides to submit additional documents. A copy of the sub-lease and the service agreement was admitted into evidence. It was agreed that the court's ruling with respect to the instant suit for $1,196.08, comprised of two bills, would apply to both actions.

The sole issue to be determined is whether the referral to CAMBRIDGE MEDICAL, PC ("Plaintiff") for Diagnostic Tests violates Public Health Law §238-a.

Public Health Law §238-a(1) reads, in pertinent part, as follows:

> A practitioner authorized to order [...] x-ray or imaging services may not make a referral
> for such services to a health care provider [...] where such practitioner [...] has a financial
> relationship with such health care provider.

Under §§ 238(3) and 13(g), "Financial relationship" is defined as an ownership interest, investment interest or compensation arrangement; and "X-ray or imaging services" shall mean diagnostic imaging techniques, which shall include but not be limited to Ultrasonography. Ultrasound is the subject of the referral herein.

This statute does not cover the following (§238-a(5)(b)(I)):

> payments made for the rental or lease of office space, if (A) there is a written agreement,
> signed by the parties, for the rental or lease of the space, which agreement specifies the
> spaced covered by the agreement [...] provides for a term of rental or lease of at least one
> year, provides for a payment on a periodic basis of an amount that is consistent with fair
> market value, provides for an amount of aggregate payments that does not vary, directly
> or indirectly, based on the volume of value of any referrals of business between the

parties, and would be considered to be commercially reasonable even if no were referrals were made between the parties.

A review of the EBT transcript of Dr. Eileen S. Dehhi, dated 9/10/09, reveals that she is the President and CEO of Cambridge Medical, P.C., and that all of the ultrasound and EMG tests are administered at the satellite offices located throughout the seven counties.  There are at least forty to forty-five medical providers.  All of the diagnostic tests that Cambridge provided, are administered in the office of the referring providers.  For each satellite office, Cambridge has a lease agreement ranging in the amount of $200-$600.  In addition, Dr. Dehhi testified that there is a service agreement for extra charges for the use of the copy machine, fax machine, secretarial staff, scheduling, rescheduling, canceling patients, janitorial services, etc.  This is a fix amount every month.

After extensive review of all the exhibits submitted; specifically, the service agreement, it is the court's opinion that the above activity violates Public Health Law § 238-a(1).

Accordingly, with regard to index number: 068221/09, Plaintiff is awarded a Judgment in the amount of $1,196.08 plus statutory interest, cost and attorney's fees.   Under index number: 048227/09, Plaintiff is awarded a Judgment in the amount of $598.04 plus statutory interest, cost and attorney's fees.

This shall be the Decision and Order of the court.

**Date**

**HON. CAROLYN E. WADE**
**Judge, Civil Court**

EXHIBIT 7

Case 2:11-cv-04454-JFB-ETB   Document 8-12   Filed 08/17/12   Page 43 of 137

### Steven J. Neuwirth, Esq.



**Steven J. Neuwirth**
*Partner*

**Admitted to practice law:** United States District Courts for the Eastern District of New York, Southern District of New York and the District of New Jersey and State Courts of New York and New Jersey.
**Practice Areas:** No-Fault/Insurance Litigation, Property Damage and Subrogation Matters, Employment, Criminal Defense
**Contacting Steven Neuwirth:**
**Phone:** (516) 741-4799
**E-Mail:** sneuwirth@bakersanders.com

Steven J. Neuwirth is a partner at the law firm of Baker, Sanders, Barshay, Grossman, Fass, Muhlstock & Neuwirth, L.L.C. Mr. Neuwirth brings extensive knowledge and experience in the areas of no-fault insurance, labor and employment law. He has vast experience in labor relations, collective bargaining, employment and public accommodation discrimination as well as wage & hour and unemployment law. Importantly, Mr. Neuwirth offers years of experience in insurance law having practiced at defense firms prior to joining the law firm. He currently supervises and handles day-to-day legal operations, appears regularly in all courts and handles all facets of litigation.

A graduate of SUNY at Stony Brook and New York Law School, Mr. Neuwirth is admitted to practice in the United States District Courts for the Eastern District of New York, Southern District of New York and the District of New Jersey, as well as the State Courts of New York and New Jersey. He appears regularly in the federal and state courts as well as at various administrative and arbitration proceedings.

Prior to joining the firm, Mr. Neuwirth spent years practicing in the areas of employment and criminal defense. He also was a senior associate at an insurance defense law firm where he litigated no-fault, property damage and subrogation matters.

Mr. Neuwirth regularly lectures attorneys and judges on the practice of law in No-Fault litigation in the New York State and local bar associations. He also regularly appears before medical groups on No-Fault and other matters of concern to medical providers. Mr. Neuwirth is also an active member of the Queens County Bar Association, where he serves on the Civil Court Committee, and regularly meets with judges and court staff to effectuate the interests of his clients. He also served as a Small Claims Arbitrator in New York City Civil Court, Queens County and in Suffolk County District Court. Additionally, he has volunteered as a moot court judge for the annual National Wagner Moot Court Competition. Lastly, he has served in various positions on the Board of Directors of the Kings Park Jewish Center including its Executive Vice President and Chairman.

Copyright © 2010. All Rights Reserved. Baker, Sanders, Barshay, Grossman, Fass, Muhlstock & Neuwirth, L.L.C.
Attorneys and Counselors at Law. Attorney Advertising. *(v2r102010)*

Personal Injury, Consumer & Medical Collection Law Firm | Baker Sanders, Barshay...    Page 1 of 2

HOME    ATTORNEYS    PERSONAL INJURY    MASS TORTS    CONSUMER COLLECTIONS    CONTACT US

### About The Firm

 **National Collections and Personal Injury Law Firm**

In early 2004, Sanders, Grossman, Fass & Muhlstock, P.C. and the law offices of Baker Barshay & Neuwirth, LLP, merged to form one of the largest Medical Collection firms in the State of New York. Since then Baker, Sanders, Barshay, Grossman, Fass, Muhlstock & Neuwirth, L.L.C., has represented over 7,000 medical providers in New York and New Jersey. In addition, the firm has achieved significant results for personal injury clients through its extensive experience and exceptional trial work.

Reaching the peak within the Medical Collections arena as well as Personal Injury, the firm later diversified its practices and expertise to consumer debt collections. Developing an innovative strategy over the years, today, the firm serves at a national scope representing one of the largest issuers of credit in the world.

The firm's ability to sustain such a massive clientele base and facilitate successful recoveries for their clients is attributed to

### On The Front Line

 **Industrial Canal Breach Litigation**

On August 29, 2005, one of the deadliest and costliest natural disasters in United States history hit the southern shores of Louisiana. Hurricane Katrina caused great damage to much of the north-central Gulf Coast, especially New Orleans.

Prior to the storm, six barges were moored by Lafarge North America, in front of its facility by the Industrial Canal. Two of them were owned by Ingram and at the time, being operated by Lafarge. Lafarge had finished offloading one of the barges less than 48 hours before Katrina's arrival.

Baker Sanders represents the Lower 9th Ward and 22,500 homeowners in claims against LaFarge. To learn more about The Barge case, click here.

the company's size, state-of-the-art infrastructure and most importantly zealously talented attorneys.

Take a few minutes to explore our web site and learn about the role our firm plays in the growing area of personal injury, medical and consumer collections. Feel free to click the "contact us" button to request more information or call us at our Garden City office at 516-741-4799.

### Resources

 **No Fault Paradise Blog**
nofaultparadise.org

 **Learn more about Personal Injury, Consumer Collection and Medical Collection.**

 **Seminar Event Calendar**
There are currently no seminars or events scheduled. Please check back soon.

 **Contact Us**
100 Garden City Plaza - Suite 500
Garden City, New York 11530
(516) 741-4799

Home • News & Events • Practice Areas • Attorneys • Legal Resources • Blog • Collections • Contact Us • Site Map • Legal & Privacy Policy • Login

Copyright © 2010. All Rights Reserved. Baker, Sanders, Barshay, Grossman, Fass, Muhlstock & Neuwirth, L.L.C.
Attorneys and Counselors at Law. Attorney Advertising. *(v2r102010)*

.

EXHIBIT 8

CIVIL COURT OF THE CITY OF NEW YORK          **Index No: 068221/09**
COUNTY OF KINGS
-------------------------------------------------------------------
CAMBRIDGE MEDICAL, P.C.
A/A/O Luan Tran                                          **PLAINTIFF'S**
                                                        **TRIAL MEMO**
                                    Plaintiff,

            -against-

ALLSTATE INSURANCE COMPANY

                                    Defendant.
-------------------------------------------------------------------

1. Dr. Debbi, the owner of Cambridge Medical, PC ("Cambridge") did testify at her
   September 10, 2009 deposition that all of Cambridge's ultrasound tests are administered
   at the offices of the 40 to 45 medical providers who have requested that Cambridge
   perform these tests on their patients.  Dr. Debbi also testified that Cambridge pays a
   rental fee for the office space use.  Defendant, in their trial memo, mischaracterizes these
   payments as referral fees.

2. The instant case does not fall within the ambit § 238-a of the Public Health Law.  The
   language of the statute plainly reads as follows: Prohibition of financial arrangements and
   referrals 1. (a) A practitioner authorized to order *clinical laboratory services, pharmacy*
   *services, radiation therapy services or x-ray or imaging services* may not make a referral
   for such services to a health care provider authorized to provide such services where such
   practitioner or immediate family member of such practitioner has a *financial relationship*
   with such health care provider.  (b) A health care provider or a referring practitioner may
   not present or cause to be presented to any individual or third party payor or other entity a
   claim, bill, or other demand for payment for *clinical laboratory services, pharmacy*

***services, radiation therapy services or x-ray or imaging services*** furnished pursuant to a

referral prohibited by this subdivision * * * (emphasis added).

3. It should be noted that the various provisions of § 238-a of the Public Health Law have

   different effective dates and said section contains a number of exceptions and definitions.

4. Even assuming the services in question fall within the ambit of 238(a), which they do not,

   Cambridge would be exempt in accordance with  Section 3 (i) of § 238-a of NYS Public

   Health Law which contains the following exception, that a compensation arrangement

   shall not include:

   payments made for the rental or lease of office space, if (A) there is a written agreement,
   signed by the parties, for the rental or lease of the space, which agreement specifies the
   space covered by the agreement and dedicated for the use of the lessee, provides for a
   term of rental or lease of at least one year, provides for a payment on a periodic basis of
   an amount that is consistent with fair market value, provides for an amount of aggregate
   payments that does not vary, directly or indirectly, based on the volume or value of any
   referrals of business between the parties, and would be considered to be commercially
   reasonable even if no referrals were made between the parties; or (B) in the case of rental
   or lease of office space in which a practitioner who is an interested investor, or an
   interested investor who is an immediate family member of the practitioner, has an
   ownership or investment interest, the office space is in the same building as the building
   in which the practitioner or group practice of which the practitioner is a member has a
   practice

5. The rental fee for the office space was paid pursuant to a written and signed agreement

   for the rental of specified space for Cambridge's use.  The lengths of the leases are also

   consistent with the statute and the amounts paid are consistent with fair market value.

   Defendant acknowledges that there are exemptions to §238-a, but they provide no

   justification why any would not be applicable here.

6. Defendant offers no evidence or proof of any kind, including what would presumably be

   necessary expert testimony on the issue of per square footage valuation to support their

   defense.

7.  In addition to §238-a, various New York State statutes including N.Y. Education Law §6509-a prohibit fee-splitting by health professionals.

8.  The purpose of these sections proscribing fee-splitting by health professionals was to regulate medical facilities supported by New York State Medicaid assistance funds; they were not primarily meant to benefit consumers of medical services generally or private health maintenance organizations. Deutsch v. Health Ins. Plan of Greater New York, 1983, 573 F.Supp. 1443.

9.  While it is the established public policy of this State that medical providers may not engage in voluntary prospective fee-splitting arrangements (see, Education Law § 6509-a; 8 NYCRR 29.1 [b]; United Calendar Mfg. Corp. v Huang, 94 AD2d 176), this blanket proscription against fee-splitting does not extend to a licensed professional associated with or employed by a professional corporation formed to provide medical services (see, Education Law § 6509-a; 8 NYCRR 29.1 [b]; Albany Med. Coll. v McShane, 66 NY2d 982; Dolin v Long Is. Jewish Med. Ctr., 139 AD2d 487; cf., Hauptman v Grand Manor Health Related Facility, 121 AD2d 151).

10. Other instances where the court held that a contractual fee arrangement did not constitute an illegal kickback or improper fee splitting include: a psychiatrist who paid 20% of his fees to medical corporation for admission to a nursing home Hauptman v. Grand Manor Health Related Facility, Inc. (1 Dept. 1986) 121 A.D.2d 151, 502 N.Y.S.2d 1012 and a cardiologist who tried to recover difference between the hospital's billing rate for his services and the contract rate under a theory of quasi contract Zador v. Millard Fillmore Hosp. (4 Dept. 1999) 261 A.D.2d 876, 689 N.Y.S.2d 816

11. Here Defendant cites cases that are factually different and simply states that the amounts

    paid for rent were an improper referral that violates § 238-a of the Public Health Law.

    Defendant has not presented any facts that would support this conclusion.  As a matter of

    law, this Court must determine that there is no violation of Public Health Law 238-a and

    thus payment for services rendered by the Plaintiff is proper.

Dated: Garden City, New York
       March 31, 2011

                                        M. Hoffe
                                        _____
                                        Baker, Sanders, Barshay, Grossman,
                                        Fass, Muhlstock & Neuwirth, L.L.C.
                                        100 Garden City Plaza - Suite 500
                                        Garden City, New York 11530
                                        (516) 741-4799

                                        _____
                                        Co-Counsel for the Plaintiff
                                        Matthew J. Conroy & Associates, PC
                                        350 Old Country Road, Suite 106
                                        Garden City, NY  11530
                                        (516) 248-2425

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS

Index No: 068221/09

CAMBRIDGE MEDICAL, P.C., A/A/O Luan Tran

Plaintiff,

**AFFIDAVIT OF SERVICE**

- against -

ALLSTATE INSURANCE COMPANY

Defendant.

STATE OF NEW YORK )
COUNTY OF SUFFOLK ) ss.

I, FARUKH ABDULLAYEV , being duly sworn say:

I am over 18 years old and am not a party to this action. On **MAR 3 1 2011** , I
served upon the defendant herein a copy of the annexed plaintiff's trial memo by depositing
same in a post-paid envelope in care of the United States Post Office, and affixed thereupon was
the defendant's address:

SHORT & BILLY, P.C.
217 BROADWAY, SUITE 300
NEW YORK, NEW YORK 10007

**MAR 3 1 2011**

Sworn to before me

Notary Public

BS-3082-910562

ROSEMARIE M. MADRID
Notary Public, State of New York
No. 01MA6232858
Qualified in Queens County
Commission Expires December 13, 2014

Page 1

**CIVIL COURT OF THE CITY OF NEW YORK**
**COUNTY OF KINGS**
--------------------------------------------------------------------

**CAMBRIDGE MEDICAL, P.C.**
**A/A/O Veronica Paduano**

Index No. 48277/09

**PLAINTIFF'S**
**TRIAL MEMO**

                          Plaintiff,

            -against-

Hon. Carolyn Wade

**ALLSTATE INSURANCE COMPANY,**

                         Defendant.
--------------------------------------------------------------------

1. Plaintiff, by its attorneys, Baker, Sanders, Barshay, Grossman, Fass, Muhlstock & Neuwirth, submits this memorandum in opposition to the arguments raised by the defendant.

2. The defendant argues that the plaintiff engaged in a referral in violation of Public Health Law 238-a. However, for the following reasons, the defense presented herein by the defendant must fail.

3. Dr. Debbi, the owner of Cambridge Medical, PC ("Cambridge") did testify at her September 10, 2009 deposition that all of Cambridge's ultrasound tests are administered at the offices of the 40 to 45 medical providers who have requested that Cambridge perform these tests on their patients. Dr. Debbi also testified that Cambridge pays a rental fee for the office space use. Defendant, in their trial memo, mischaracterizes these payments as referral fees.

4. The instant case does not fall within the ambit § 238-a of the Public Health Law. The [la]nguage of the statute plainly reads as follows: Prohibition of financial arrangements and [referra]ls 1. (a) A practitioner authorized to order *clinical laboratory services, pharmacy*

*services, radiation therapy services or x-ray or imaging services* may not make a referral for such services to a health care provider authorized to provide such services where such practitioner or immediate family member of such practitioner has a *financial relationship* with such health care provider.  (b) A health care provider or a referring practitioner may not present or cause to be presented to any individual or third party payor or other entity a claim, bill, or other demand for payment for *clinical laboratory services, pharmacy services, radiation therapy services or x-ray or imaging services* furnished pursuant to a referral prohibited by this subdivision * * * (emphasis added).

5.  It should be noted that the various provisions of § 238-a of the Public Health Law have different effective dates and said section contains a number of exceptions and definitions.

6.  Even assuming the services in question fall within the ambit of 238(a), which they do not, Cambridge would be exempt in accordance with  Section 3 (i) of § 238-a of NYS Public Health Law which contains the following exception, that a compensation arrangement shall not include:

payments made for the rental or lease of office space, if (A) there is a written agreement, signed by the parties, for the rental or lease of the space, which agreement specifies the space covered by the agreement and dedicated for the use of the lessee, provides for a term of rental or lease of at least one year, provides for a payment on a periodic basis of an amount that is consistent with fair market value, provides for an amount of aggregate payments that does not vary, directly or indirectly, based on the volume or value of any referrals of business between the parties, and would be considered to be commercially reasonable even if no referrals were made between the parties; or (B) in the case of rental or lease of office space in which a practitioner who is an interested investor, or an interested investor who is an immediate family member of the practitioner, has an ownership or investment interest, the office space is in the same building as the building in which the practitioner or group practice of which the practitioner is a member has a practice

7.  The rental fee for the office space was paid pursuant to a written and signed agreement for the rental of specified space for Cambridge's use.  The lengths of the leases are also

consistent with the statute and the amounts paid are consistent with fair market value. Defendant acknowledges that there are exemptions to §238-a, but they provide no justification why any would not be applicable here.

8.  Defendant offers no evidence or proof of any kind, including what would presumably be necessary expert testimony on the issue of per square footage valuation to support their defense.

9.  In addition to §238-a, various New York State statutes including N.Y. Education Law §6509-a prohibit fee-splitting by health professionals.

10. The purpose of these sections proscribing fee-splitting by health professionals was to regulate medical facilities supported by New York State Medicaid assistance funds; they were not primarily meant to benefit consumers of medical services generally or private health maintenance organizations. Deutsch v. Health Ins. Plan of Greater New York, 1983, 573 F.Supp. 1443.

11. While it is the established public policy of this State that medical providers may not engage in voluntary prospective fee-splitting arrangements (see, Education Law § 6509-a; 8 NYCRR 29.1 [b]; United Calendar Mfg. Corp. v Huang, 94 AD2d 176), this blanket proscription against fee-splitting does not extend to a licensed professional associated with or employed by a professional corporation formed to provide medical services (see, Education Law § 6509-a; 8 NYCRR 29.1 [b]; Albany Med. Coll. v McShane, 66 NY2d 982; Dolin v Long Is. Jewish Med. Ctr., 139 AD2d 487; cf., Hauptman v Grand Manor Health Related Facility, 121 AD2d 151).

12. Other instances where the court held that a contractual fee arrangement did not constitute an illegal kickback or improper fee splitting include: a psychiatrist who paid 20% of his

fees to medical corporation for admission to a nursing home <u>Hauptman v. Grand Manor</u> <u>Health Related Facility, Inc. (1 Dept. 1986) 121 A.D.2d 151, 502 N.Y.S.2d 1012</u> and a cardiologist who tried to recover difference between the hospital's billing rate for his services and the contract rate under a theory of quasi contract <u>Zador v. Millard Fillmore</u> <u>Hosp. (4 Dept. 1999) 261 A.D.2d 876, 689 N.Y.S.2d 816</u>

13. Here Defendant cites cases that are factually different and simply states that the amounts paid for rent were an improper referral that violates § 238-a of the Public Health Law. Defendant has not presented any facts that would support this conclusion. As a matter of law, this Court must determine that there is no violation of Public Health Law 238-a and thus payment for services rendered by the Plaintiff is proper.

14. Moreover, and equally important, assuming, *arguendo,* that the defendant's arguments regarding prohibited referrals was valid with respect to the services in this matter, in order to prevail on this argument, the defendant would be required to establish 1) that a practitioner authorized to order the services in dispute, 2) made a referral for these services to the plaintiff and 3) the ordering practitioner has a financial relationship with the plaintiff. PHL 238-a(a). The proof presented herein has not established these facts, as the defendant has not established that the plaintiff has a financial relationship with the referring physician. The only arguable proof of a "financial relationship" are the lease and service agreements. The sublessor and servicer in those agreements is SPA Realty Corporation (see the lease and service agreements previously submitted to this Court in *Cambridge Medical, PC a/a/o Tran v. Allstate Ins. Co.,* index number 68221/09). It has not been established, or even alleged, that SPA Realty Corporation is "a practitioner authorized to order clinical laboratory services, pharmacy services, radiation therapy

services or x-ray or imaging services . . ." nor has it been established, or alleged, that SPA Realty Corporation "ma[de] a referral for such services" performed by the plaintiff. Accordingly, a key element of defendant's defense has not been, nor can it be, established, and therefore, as a matter of law, the defense presented by the defendant herein must fail.

15. With respect to the independent contractor defense and defendant's trial subpoena raised in defendant's trial memo, plaintiff previously complied with the defendant's trial subpoena and permitted defense counsel to inspect the W-2 forms issued by the plaintiff to its technicians. In fact, on the record previously before this Court under index number 68221/09, defense counsel acknowledged compliance with the subpoena and also acknowledged that he was satisfied with the proof presented to him. Defense counsel therefore withdrew that portion of the defense concerning the independent contractor argument.

16. As no other defense has been presented, and as the parties stipulated to plaintiff's *prima facie* case, plaintiff is entitled to judgment as a matter of law for the amount sought in the ad damnum clause, together with statutory interest, attorney fees, costs and disbursements.

Dated: Garden City, New York
April 28, 2011

Steven J. Neuwirth
Baker, Sanders, Barshay, Grossman,
Fass, Muhlstock & Neuwirth, L.L.C.
100 Garden City Plaza - Suite 500
Garden City, New York 11530
(516) 741-4799
BS-3082-903657

To:    Short & Billy, PC
        Attorneys for Defendant
        217 Broadway, Suite 300
        New York, NY 10007
        (212) 732-3320

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS

CAMBRIDGE MEDICAL, P.C.A/A/O Veronica Paduano

Plaintiff,

Index No. 48277/09

- against -

ALLSTATE INSURANCE COMPANY,

Defendant.

PURSUANT TO SECTION 130-1 OF THE RULES OF THE CHIEF ADMINISTRATOR (22 NYCRR) I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF, FORMED AFTER AN INQUIRY REASONABLE UNDER THE CIRCUMSTANCES, THE WITHIN MEMORANDUM IS NOT FRIVOLOUS.

Notice Pursuant to CPLR 2103(5) declining service by electronic transmittal

**BAKER, SANDERS, BARSHAY, GROSSMAN, FASS, MUHLSTOCK & NEUWIRTH**
Attorneys for Plaintiff
100 Garden City Plaza, Suite 500
Garden City, NY 11530
(516) 741-4799
FAX: (516) 741-0128
Our Case No: **BS-3082-903657**

To:     Short & Billy, PC
        Attorneys for Defendant
        217 Broadway, Suite 300
        New York, NY 10007

Attorney for defendant
Service of a copy of the within TRIAL MEMO is hereby admitted.

Dated:

_____
Attorney for Defendant

**CIVIL COURT OF THE CITY OF NEW YORK**
**COUNTY OF KINGS**
-------------------------------------------------------------------------

**CAMBRIDGE MEDICAL P.C.**
**A/A/O Luan Tran**

                                                                    **DEFENDANTS**
                                                                    **TRIAL MEMO**

                              **Plaintiff,**

            **-against-**

**ALLSTATE  INSURANCE COMPANY**

                              **Defendant.**
-------------------------------------------------------------------------

POINT 1:  THE REFERRAL TO PLAINTIFF FOR ULTRASOUND
              STUDIES VIOLATES PUBLIC HEALTH LAW, SECTION 238

1.Dr. Debbi, the owner of Cambridge Medical has testified at her Sept. 10, 2009

deposition that all of Cambridge's ultrasound tests are administered at the offices of the

40 to 45 medical providers who have requested Cambridge to perform these tests on their

Patients.In return for this referral, Cambridge has testified that it pays the referring

provider a rental fee for the office space used, and a  monthly service fee for various

services and supplies it allegedly received from the referring provider.


2.This referral violates Section 238-a of the Public Health Law and is a complete defense

to plaintiff's claim in this action. No denial is needed to defend on these grounds, see

OzonePark Medical Diagnostics Assoc.V. Allstate 180 Misc2d 105 ( App Term 2d Dept

1999).

3.The defense of improper referral is not a precludable defense, Fair Price v Elrac. 12

Misc3d 119 (App term 2nd & 11th Districts 2006) see Ozone Park v Allstate supra, also,

Stand Up MRI v General Assurance 10 Misc3d 551  (Suffolk Dist Ct, 2005).


4.In the recent case of Dr Matrangolo v Allstate , New York Civil # 54569/09, Judge

Samuels dismissed plaintiff's complaint based on that plaintiff's failure to disclose the

lease agreement  with it's referring provider.


5. Section 238-a of the Public Health Law prohibits self-referrals and is specifically

applicable to Ultrasound , see section 238-(13g). Section 238-a prohibits referrals to a

provider with which the practitioner has a financial relationship, see section 238-a (1)(a).

A violation of this defense is a complete defense to a claim for payment of the medical

services.


6.While some lease agreements may qualify as "safe harbors" (subsection 5(b)(i) , there

is no such exemption for service agreements in Section 238-a.


7.Moreover, Section 238-d requires disclosure to the patients of these financial

relationships between Cambridge and its' referring providers. Failure to disclose is a

violation which precludes Cambridge from collecting No fault benefits on these

ultrasound bills , see Fair Price v Elrac, supra.


8.In prior deposition testimony, Cambridge has admitted making payments to it's

referring providers, and, accordingly,  the defendant has subpoenaed Plaintiff to produce

the lease/service agreements with the referring provider for the bills at issue, and the financial records that document these payments.

9.Failure to produce these subpoenaed documents is contempt of court and is punishable by striking a party's pleadings, see CPLR 2308.

10. Section 238-a&d of the Public Health Law forbids medical providers from referring patients to other medical providers with whom they have a financial relationship. Plaintiff has violated both the letter and the intent of this statute, and should not be allowed compensation for the tests performed.


POINT II; PLAINTIFF CANNOT COLLECT NO FAULT BENEFITS FOR WORK DONE BY INDEPENDENT CONTRACTORS.

11. If the services were rendered by independent contractors, that disqualifies plaintiff from collecting no fault benefits for those services since the plaintiff is not considered to be the "provider" of those services, see A.B. Medical Services v Liberty Mutual 9 Misc3d 36 (App Term 2d Dept 2005), see also Rockaway Blvd Medical v Progressive 9 Misc.3d 52 (App Term 2d Dept. 2005), East Coast Acupuncture v NY Central Mutual, 2008 NY Slip Op 50344 (U) (App Term , 2d Dept, 2008).

12.Plaintiff has repeatedly refused to disclose the W-2 and/or 1099 forms for the "technicians" who do the actual work. Accordingly, we have subpoenaed the W-2 and/or 1099 Forms that Plaintiff issued in 2009 to these technicians.

13Failure to produce these subpoenaed documents is contempt of court and is punishable

by striking a party's pleadings, see <u>CPLR 2308.</u>

Dated: Feb. 28, 2011                                SHORT & BILLY, P.C.
New York, NY

                                                    By:  Mark A. Puleo, Esq.
                                                    Attorneys for the Defendant,
                                                    217 Broadway, New York, NY 10007
                                                    212-732-3320

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS

-------------------------------------------------------------------------

CAMBRIDGE MEDICAL P.C.
a/a/o Veronica Paduano

                                                            Index 048277/09
                                                            DEFENDANTS
                                                            TRIAL MEMO

                              Plaintiff,

               -against-

ALLSTATE  INSURANCE COMPANY

                              Defendant.

-------------------------------------------------------------------------


POINT 1:  THE REFERRAL TO PLAINTIFF FOR DIAGNOSTIC
          TESTS VIOLATES PUBLIC HEALTH LAW, SECTION 238


1.Dr. Debbi, the owner of Cambridge Medical has testified at her Sept. 10, 2009

deposition that all of Cambridge's ultrasound and EMG tests are administered at the

offices of the 40 to 45 medical providers who have requested Cambridge to perform these

tests on their Patients. In return for this referral, Cambridge has testified that it pays the

referring provider a rental fee for the office space used, and a  monthly service fee for

various services and supplies it allegedly received from the referring provider.


2. In the present action, Cambridge provided <u>ultrasound (</u>echograms) tests at the office of

David Shapiro, DC, pursuant to his referral. This referral violates <u>Section 238-a of the</u>

<u>Public Health Law</u> and is a complete defense to plaintiff's claim in this action. No denial

is needed to defend on these grounds, see <u>Ozone Park Medical Diagnostics Assoc.v.</u>

<u>Allstate</u> 180 Misc2d 105 ( App Term 2d Dept 1999).

3.The defense of improper referral is not a precludable defense, Fair Price v Elrac. 12 Misc3d 119 (App term 2nd & 11th Districts 2006) see Ozone Park v Allstate supra, also, Stand Up MRI v General Assurance 10 Misc3d 551 (Suffolk Dist Ct, 2005), and can be raised even if no denial was issued, see Ozone Park V Allstate, supra.

4. In the recent case of Dr. Matrangolo v Progressive , NY Civil Court Index 52599/09 Judge Engoron dismissed plaintiff's complaint for failing to disclose the lease in opposition to defendant's summary judgment motion, noting that it is the medical provider's burden to prove that it's lease falls within any safe harbor sections of Section 238-a. .In Civil Queens, Judge Buggs similarly dismissed numerous cases By Dr. Matangolo and Dr. Felderstein for violation of Section 238 of the Public Health Law (see 2 annexed sample decisions), noting that plaintiff had not proven it was exempt from the statute. See also United States v Carlisle HMA 554 F.3d 88 (3RD Circuit Court of Appeals 2009) where the court indicated that the 'burden shifts to the defendant to establish that its conduct was protected by (a statutory) exception." citing United States v Rogan 459 F. Supp.2d 692, 716 (ND.Ill. 2006).

5. Section 238-a of the Public Health Law prohibits self-referrals and specifically mentions Ultrasound as an "x-ray or imaging service covered by the statute , see Section 238(13g). Section 238-a prohibits referrals to a provider with which the practitioner has a financial relationship, see section 238-a (1)(a).A violation of this defense is a complete defense to a claim for payment of the medical Services, since Section238-a (1)(b) indicates that a health care provider or a referring practioner may not present to any

individual or third party payor a claim or bill for services furnished pursuant to a referral prohibited by this statute.

6. While some lease agreements may qualify as "safe harbors" (subsection 5(b)(i) , there is no such exemption for <u>service agreements</u> in Section 238-a. Cambridge has admitted that it has service agreement with all its referring providers. The service agreement is a per ser violation of the statute, since there is no "safe harbor" provision in the statute for any type of service agreements.

7. Moreover, even if the referral for a particular service or test does not fall within the list of prohibited referrals listed in Section 238-a, for all other types of referrals (ie: EMG testing) Section 238-d requires written <u>disclosure to the patients</u> of the financial relationships between Cambridge and its' referring providers for the EMG tests it performs Failure to disclose is a violation which precludes Cambridge from collecting No fault benefits on those bills , see <u>Fair Price v Elrac,</u> supra. Cambridge has not disclosed it's financial relationships for either ultrasound or EMG testing,

8. In prior deposition testimony, Cambridge has admitted making these payments to it's referring providers, and, accordingly, the defendant has subpoenaed Plaintiff to produce the lease/service agreements with the referring provider for the bills at issue, and the financial records that document these payments.

9. Failure to produce these subpoenaed documents is contempt of court and is punishable by striking a party's pleadings, see <u>CPLR 2308.</u>

10. Section 238-a&d of the Public Health Law forbids medical providers from referring patients to other medical providers with whom they have a compensation arrangement or financial relationship. Plaintiff has violated both the letter and the intent of this statute, and should not be allowed compensation for the tests performed.


Dated: April 12 2011                                  SHORT & BILLY, P.C.
New York, NY

                                          By: Mark A. Puleo, Esq.
                                          Attorneys for the Defendant,
                                          217 Broadway, New York, NY 10007
                                          212-732-3320

RECEIVED
(w) DEC 0 6 2010
SHORT & BILLY, P.C.

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: PART 41
------------------------------------------------------------x
DR. STEPHEN MATRANGOLO, D.C., P.C. a/a/o
David Fitzhugh,                                              Index Number: 52599/09
                                    Plaintiff,

                                                            Decision and Order

            - against -

PROGRESSIVE CASUALTY INS. COMPANY,
                                    Defendant.
------------------------------------------------------------x
Arthur F. Engoron, Judge

In compliance with CPLR 2219(a), this Court states that the following papers, numbered 1 to 3, were
used on this motion by defendant for summary judgment and other relief:

                                                            Papers Numbered:

Moving Papers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Opposition Papers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Reply Papers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Upon the foregoing papers, the instant motion is granted.

Background
Public Health Law § 238-a(1), as effective December 8, 2002,  provides that "[a] practitioner
authorized to order . . . physical therapy services . . . may not make a referral for such services to a
health care provider . . . where such practitioner . . . has a financial relationship with such health care
provider." This statute does not cover the following (§ 238-a(5)(b)(I)):

          payments made for the rental or lease of office space, if (A) there is a written
          agreement, signed by the parties, for the rental or lease of the space, which agreement
          specifies the space covered by the agreement . . . provides for a term of rental or lease
          of at least one year, provides for a payment on a periodic basis of an amount that is
          consistent with fair market value, provides for an amount of aggregate payments that
          does not vary, directly or indirectly, based on the volume or value of any referrals of
          business between the parties, and would be considered to be commercially reasonable
          even if no referrals were made between the parties.

In the instant case, plaintiff has admitted that he rents professional space from the physician(s) who
made the subject referrals.  In particular, at a 3/12/07 deposition (Moving Exh. 6) , plaintiff testified
(at pp. 11-13) that he regularly performers services outside of his home office, that he leases space
from the referring doctors, that he has written leases, that they are yearly, that the rental amount is

Page 1 of 2

not contingent on the number of referrals, that the leases indicate the rental amount, and that the rental amount is fair market value.

Discussion

This Court believes that Public Health Law § 238-a has an obvious and salutary purpose: to prevent the provision of health care from being based on financial incentive rather than patient welfare and medical necessity. The instant case implicates this issue, as plaintiff rents space from his referring physicians. Plaintiff claims that he falls within the statute's clearly-delineated "safe harbor." However, in opposition to the instant motion, he has failed (one might say "refused") to produce the best evidence, evidence within his possession, on that issue.

At oral argument plaintiff contended that the burden is on defendant to prove that he has run afoul of the Public Health Law. On a formal level, this Court believes that defendant has made out a prima facie case of a violation, because of the rental, and that the burden has shifted to plaintiff to prove inclusion within the safe harbor. On a less formal level, this Court does not believe in "ha ha, gotcha" litigation; if plaintiff seeks to rely on his written leases, let him provide them. As he has chosen not to do so, and as a violation of the statute is a complete bar to payment, whether or not the subject of a denial, plaintiff is not entitled to reimbursement; defendant is entitled to summary judgment dismissing the instant action; and the clerk is hereby directed to enter judgment accordingly.


Dated:    December 1, 2010

                                                         Arthur F. Engoron, J.C.C.


Page 2 of 2

**Civil Court of the City of New York**

County of _Queens_

Part _41_

Index Number _12 9316/00_

Motion Cal. # _100_ Motion Seq. # _____

Dr. STEPPHEN MATRANGOlo
A/o Crystal Robles

Claimant(s)/Plaintiff(s)/Petitioner(s)

against

ALLSTATE INSURANCE, CO

Defendant(s)/Respondent(s)

**DECISION/ORDER**

Recitation, as required by CPLR §2219 (a), of the papers
considered in the review of this Motion:

| Papers | Numbered |
|---|---|
| Notice of Motion and Affidavits Annexed......... | 1 |
| Order to Show Cause and Affidavits Annexed..... | |
| Answering Affidavits ............................... | 2 |
| Replying Affidavits................................... | 3 |
| Exhibits .................................................. | |
| Other...................................................... | |

Upon the foregoing cited papers, the Decision/Order on this Motion to _for Summary_

Judgment is granted in favor of Defendant ~~as follows:~~

for violation of Public Health LAW 238-a which

Proscribes financial arrangements between

referring providers and treating providers, ~~which~~

Defendant has submitted admissible evidence

in form of a transcript of an Euo of Dr Matrangolo & other evide

Confirming that he has a lease agreement with

his referring providers, Dr Matrangolo confirms this

relationship in an affidavit of Dr Matrangolo

submitted in opposition to Defendant's notion

Plaintiff did not substantiate its lease

arrangement qualified for an exception under

public health Law 238-a

_Date_

ENTERED
QUEENS COUNTY

Civil Court
of the
City of New York

FEB ... 2011

Judge, Civil Court

CIVIL COURT

FEB 16 2011

PAPERS SUBMITTED
SPECIAL TERM

FILE 26698

**Civil Court of the City of New York**

County of _Queens_

Part _41_

Dr. Marc Feldstein
aao Kevin Lozo

Claimant(s)/Plaintiff(s)/Petitioner(s)

against

ALLSTATE INSURANCE, CO

Defendant(s)/Respondent(s)

Index Number _131310/09_

Motion Cal. # _114_   Motion Seq. #

**DECISION/ORDER**

Recitation, as required by CPLR §2219 (a), of the papers considered in the review of this Motion:

| Papers | Numbered |
|---|---|
| Notice of Motion and Affidavits Annexed......... | 1 |
| Order to Show Cause and Affidavits Annexed..... | |
| Answering Affidavits ................................. | 2 |
| Replying Affidavits.................................... | 3 |
| Exhibits ................................................. | |
| Other...................................................... | |

Upon the foregoing cited papers, the Decision/Order on this Motion _for Summary Judgment_ is granted in favor of Defendant ~~as follows~~ for violation of Public Health LAW 238-a which proscribes financial arrangements between referring providers and treating providers, ~~which~~ Defendant has submitted admissible evidence in form of a transcript of an Ebo of Dr Matiangolo & other confirming that he has a lease agreement with his referring providers, Dr Matiangolo confirms this relationship in an affidavit of Dr Feldstein submitted in opposition to Defendant's motion Plaintiff did not substantiate its lease arrangement qualified for an exception under public health law 238-a.

NB
JC

Date

Civil Court
City of New York

ENTERED
QUEENS COUNTY

Judge, Civil Court

FILE 26876

EXHIBIT 9

CIVIL COURT OF THE CITY OF NEW YORK — NEW YORK COUNTY
PRESENT: HON. PETER H. MOULTON                    PART 61
                              *Civil Court Judge*

Dr. Steven Matrangelo, D.C. P.C.,
a/a/o Judy Alberto-Francis,                 Index Number___060409/09___

                    Plaintiff,
                                            **DECISION AND ORDER**
                                            **AFTER TRIAL**

                    against
                                            27732/МSR
                                            SHORT
Allstate Ins. Co.,
                                            OCT 1 4 2011
                    Defendant.

 

 

      This first party no-fault benefits action was tried before the court on July 28, 2011.[1] Neither party called any witnesses. The plaintiff attempted to prove its prima facie case by defendant's responses to its interrogatories. Defendant argued that plaintiff failed to demonstrate at trial that its lease agreement with the referring physician falls within the "safe harbor" provision of Public Health Law § 238-a. Section 238-a bars referrals where the two physicians involved have a "financial relationship." The safe harbor provision provides an exception to that prohibition. Defendant further argued that plaintiff's principal's failure to attend trial pursuant to a subpoena fatally compromised its ability to refute plaintiff's safe harbor defense.

      Defendant argued as a threshold matter that plaintiff was unable to prove its prima facie case because defendant's interrogatory responses do not establish that payment is "overdue." Defendant is correct that this an element of a plaintiff's prima facie case in a no fault case. (See, eg, Countrywide Ins. Co. v 563 Grand Med., P.C., 50 AD3d 313.) Plaintiff's counsel first appeared to argue that an overdue payment is not part of its prima facie case, and then attempted to use the defendant's denials and verification requests on the various claims to show that the payment was overdue. The demonstration that the payment was overdue could have been achieved much more economically if the plaintiff had brought a witness to trial, but the court nonetheless finds that petitioner established its prima facie case.

      Defendant's defense at trial was that Public Health Law § 238-a bars plaintiff's claims. This defense is not waived by failing to assert it in a denial of claim. (Fair Price Medical Supply Corp v ELRAC Inc., 12 Misc3d 119.)

---

[1]The court was provided with a transcript of this case, but the transcript contains the caption of a case involving the same parties tried later the same day. The caption in the transcript incorrectly reflects that the transcript is for the action under index number 60393/09, with the assignor being Annalouise Davis. As noted in the caption above the index number in this case is 60409/90, and the assignor is Judy Alberto-Francis.

Section 238-a bars referrals where the referring physician has a financial relationship with the plaintiff physician who performs services for the patient, and specifically applies to the type of physical therapy services that are the subject of the bills at issue herein.  Here the bills indicates that Dr. Matrangelo provided services to the assignor in the offices occupied by the referring physician.  Dr. Matrangelo admitted that he leases space from the referring physician, but plaintiff's counsel argued that the lease falls within the "safe harbor" provision of Public Health Law § 238-a, which states that under certain conditions a lease agreement is not a prohibited financial relationship within the ambit of the statute.

The safe harbor provision, Public Health Law § 238-a(5)(b)(I), provides that the statute's prohibition does not apply to

> Payments made for the rental or lease of lease of office space, if (A) there is a written agreement, signed by the parties, for the rental or lease of the space, which agreement specifies the space covered by the agreement ... provides for a term of rental or lease of at least one year, provides for a payment on a periodic basis of an amount that is consistent with fair market value, provides for an amount of aggregate payments that does not vary, directly or indirectly, based on the volume or value of any referrals of business between the parties, and would be considered commercially reasonable even if no referrals were made between the parties.

Plaintiff provided to defendant the applicable leases after the depositions of Dr. Matrangelo.  Defendant was therefore unable to ask Dr. Matrangelo questions about the leases.  The parties stipulated to the leases' admission.  The leases establish a financial relationship between Dr. Matrangelo and the referring physicians.  However, plaintiff failed to establish that the lease agreements were for "fair market value," and that the arrangements were "commercially reasonable."  The leases cannot speak for themselves on these points, and, as noted above, plaintiff called no witnesses.

Even if the leases set forth all the elements of a safe harbor exception, defendant's ability to probe plaintiff's evidence on this issue was fatally compromised by the failure of plaintiff's principal, Dr. Steven Matrangelo, to appear at trial pursuant to defendant's trial subpoena.  While the first subpoena served on Dr. Matrangelo was defective, and the second possibly not accompanied by the requisite fee, the first two subpoenas provided ample notice that his presence at trial was sought by defendant.  He was finally served, on the third try, with a proper subpoena accompanied by the requisite fee.

For the reasons stated I find for the defendant.  The clerk shall enter judgment dismissing the complaint.

Dated: October 11, 2011

_____
Peter H. Moulton, C.C.J.

HON. PETER H. MOULTON

2

CIVIL COURT OF THE CITY OF NEW YORK — NEW YORK COUNTY
PRESENT: HON. PETER H. MOULTON          PART 61
                               *Civil Court Judge*

Dr. Steven Matrangelo, D.C. P.C.,                    Index Number___060393/09___
a/a/o Annalouise Davis,

                   Plaintiff,                  **DECISION AND ORDER**
                                                **AFTER TRIAL**

                                                        27725/msk

                   against                      SHORT & BILLY, P.C.

Allstate Ins. Co.,                              OCT 1 4 2011

                   Defendant.

_____

        This first party no-fault benefits action was tried before the court on July 28, 2011.  Neither party called any witnesses.  The plaintiff attempted to prove its prima facie case by defendant's responses to its interrogatories.  Defendant argued that plaintiff failed to demonstrate at trial that its lease agreement with the referring physician falls within the "safe harbor" provision of Public Health Law § 238-a.  Section 238-a bars referrals where the two physicians involved have a "financial relationship."  The safe harbor provision provides an exception to that prohibition.  Defendant further argued that plaintiff's principal's failure to attend trial pursuant to a subpoena fatally compromised its ability to refute plaintiff's safe harbor defense.

        Defendant's defense at trial was that Public Health Law § 238-a bars plaintiff's claims.  This defense is not waived by failing to assert it in a denial of claim.  (Fair Price Medical Supply Corp v ELRAC Inc., 12 Misc3d 119.)  Section 238-a bars referrals where the referring physician has a financial relationship with the plaintiff physician who performs services for the patient, and specifically applies to the type of physical therapy services that are the subject of the bills at issue herein.  Here the bills indicates that Dr. Matrangelo provided services to the assignor in the offices occupied by the referring physician.  Dr. Matrangelo admitted that he leases space from the referring physician, but plaintiff's counsel argued that the lease falls within the "safe harbor" provision of Public Health Law § 238-a, which states that under certain conditions a lease agreement is not a prohibited financial relationship within the ambit of the statute.

        The safe harbor provision, Public Health Law § 238-a(5)(b)(I), provides that the statute's prohibition does not apply to

                Payments made for the rental or lease of lease of office space, if (A) there is a written
                agreement, signed by the parties, for the rental or lease of the space, which agreement
                specifies the space covered by the agreement ... provides for a term of rental or lease of
                at least one year, provides for a payment on a periodic basis of an amount that is

                                        I

consistent with fair market value, provides for an amount of aggregate payments that does not vary, directly or indirectly, based on the volume or value of any referrals of business between the parties, and would be considered commercially reasonable even if no referrals were made between the parties.

Plaintiff provided to defendant the applicable lease after the depositions of Dr. Matrangelo.  Defendant was therefore unable to ask Dr. Matrangelo questions about the lease.   The parties stipulated to the lease's admission.  The lease establishes a financial relationship between Dr. Matrangelo and the referring physicians.  However, plaintiff failed to establish that the lease agreements were for "fair market value," and that the arrangements were "commercially reasonable."  The lease cannot speak for itself on these points, and, as noted above, plaintiff called no witnesses.

Even if the lease set forth all the elements of a safe harbor exception, defendant's ability to probe plaintiff's evidence on this issue was fatally compromised by the failure of plaintiff's principal, Dr. Steven Matrangelo, to appear at trial pursuant to defendant's trial subpoena.  While the first subpoena served on Dr. Matrangelo was defective, and the second possibly not accompanied by the requisite fee, the first two subpoenas provided ample notice that his presence at trial was sought by defendant.  He was finally served, on the third try, with a proper subpoena accompanied by the requisite fee.

For the reasons stated I find for the defendant.  The clerk shall enter judgment dismissing the complaint.

Dated: October 12, 2011

Peter H. Moulton, *C.C.J.*

HON. PETER H. MOULTON

2

CIVIL COURT OF THE CITY OF NEW YORK — NEW YORK COUNTY
PRESENT:  HON. PETER H. MOULTON          PART 61
                                        *Civil Court Judge*

Dr. Steven Matrangelo, D.C. P.C.,                    Index Number___060388/09___
a/a/o Maria Fernandez,

                    Plaintiff,             DECISION AND ORDER
                                           AFTER TRIAL

                    against

Allstate Ins. Co.,

                    Defendant.



        This first party no-fault benefits action was tried before the court on July 28, 2011.  Neither party called any witnesses.  The plaintiff attempted to prove its prima facie case by defendant's responses to its interrogatories.  Defendant argued that plaintiff failed to demonstrate at trial that its lease agreement with the referring physician falls within the "safe harbor" provision of Public Health Law § 238-a.  Section 238-a bars referrals where the two physicians involved have a "financial relationship."  The safe harbor provision provides an exception to that prohibition.  Defendant further argued that plaintiff's principal's failure to attend trial pursuant to a subpoena fatally compromised its ability to refute plaintiff's safe harbor defense.

        Defendant's defense at trial was that Public Health Law § 238-a bars plaintiff's claims.  This defense is not waived by failing to assert it in a denial of claim.  (Fair Price Medical Supply Corp v ELRAC Inc., 12 Misc3d 119.)  Section 238-a bars referrals where the referring physician has a financial relationship with the plaintiff physician who performs services for the patient, and specifically applies to the type of physical therapy services that are the subject of the bills at issue herein.  Here the bills indicates that Dr. Matrangelo provided services to the assignor in the offices occupied by the referring physician.   Dr. Matrangelo admitted that he leases space from the referring physician, but plaintiff's counsel argued that the lease falls within the "safe harbor" provision of Public Health Law § 238-a, which states that under certain conditions a lease agreement is not a prohibited financial relationship within the ambit of the statute.

        The safe harbor provision, Public Health Law § 238-a(5)(b)(I), provides that the statute's prohibition does not apply to

                Payments made for the rental or lease of lease of office space, if (A) there is a written agreement, signed by the parties, for the rental or lease of the space, which agreement specifies the space covered by the agreement ... provides for a term of rental or lease of at least one year, provides for a payment on a periodic basis of an amount that is

                                        1

consistent with fair market value, provides for an amount of aggregate payments that does not vary, directly or indirectly, based on the volume or value of any referrals of business between the parties, and would be considered commercially reasonable even if no referrals were made between the parties.

Plaintiff provided to defendant the applicable lease after the depositions of Dr. Matrangelo. Defendant was therefore unable to ask Dr. Matrangelo questions about the lease. The parties stipulated to the lease's admission. The lease establishes a financial relationship between Dr. Matrangelo and the referring physicians. However, plaintiff failed to establish that the lease agreements were for "fair market value," and that the arrangements were "commercially reasonable." The lease cannot speak for itself on these points, and, as noted above, plaintiff called no witnesses.

Even if the lease set forth all the elements of a safe harbor exception, defendant's ability to probe plaintiff's evidence on this issue was fatally compromised by the failure of plaintiff's principal, Dr. Steven Matrangelo, to appear at trial pursuant to defendant's trial subpoena. While the first subpoena served on Dr. Matrangelo was defective, and the second possibly not accompanied by the requisite fee, the first two subpoenas provided ample notice that his presence at trial was sought by defendant. He was finally served, on the third try, with a proper subpoena accompanied by the requisite fee.

For the reasons stated I find for the defendant. The clerk shall enter judgment dismissing the complaint.

Dated: October 12, 2011

Peter H. Moulton, *C.C.J.*

HON. PETER H. MOULTON

EXHIBIT 10



```
 1                          CIVIL COURT OF THE CITY OF NEW YORK
                            COUNTY OF NEW YORK:   TRIAL TERM PART 66
 2
                            -----------------------------                       1
 3                          DR. STEPHEN MATRANGOLO, DC, PC,
                            AAO JOSEPH INFUSO
 4                          AAO LUIGI FANELLI                        INDEX NOS.
                            AAO GERTINA JACKSON                      CV-012997-09/NY
 5                          AAO SALVATORE MUSCARA,                   CV-050716-09/NY
                                                                    CV-012988-09/NY
 6                                                                  CV-012992-09/NY
                                                    PLAINTIFFS,
 7                                    -against-

 8                          ALLSTATE INSURANCE COMPANY,

 9                          -----------------------------  DEFENDANT.

10                          Continued Bench Trial/Decisions
                            DATED:
11                                    Wednesday, January 4th, 2012
                                      111 Centre Street
12                                    New York, New York  10013

13                              B  E  F  O  R  E:
                                    HONORABLE DEBRA ROSE SAMUELS, J.C.C.
14                          A  P  P  E  A  R  A  N  C  E  S:

15                          LAW OFFICE OF LEON KUCHEROVSKY, ESQ.
                                      Attorney for Plaintiffs
16                                    212 West 35th Street, 16th Floor
                                      New York, New York 10001
17                          BY:       MATTHEW K. VIVERITO, ESQ.

18

19                          SHORT & BILLY, P.C.
                                      Attorneys for Defendant
20                                    217 Broadway, Suite 300
                                      New York, New York 10007
21                          BY:       MARK A. PULEO, ESQ.
                                           and
22                                    CHRISTOPHER O'DONNELL, ESQ.

23

24

25
                                      DeWAYNE SCHMIDT
                                OFFICIAL COURT REPORTE
```

2

1         THE COURT:  Here's what was produced

2    pursuant to the subpoena.  Take a look at those two

3    leases.  There should be at least two.  Please have a

4    seat.  Luigi Fanelli is the index number 50716 of '09

5    and the address where services were rendered against

6    for Luigi Fanelli was what?

7         MR. VIVERITO:  One moment, your Honor.

8         MR. PULEO:  301 Amboy Road, Staten Island

9    New York, 10306.

10        MR. VIVERITO:  3010 Amboy road, yeah.

11        THE COURT:  Okay.

12        MR. VIVERITO:  And my client and my witness

13   were unable to for whatever reason produce the lease

14   for that location.  The only thing I have to say

15   about that, I think I could probably with your

16   Honor's permission a brief closing as to all these

17   matters, but I acknowledge forthwith that there's no

18   lease for that location.

19        MR. PULEO:  And if I may, your Honor, I

20   would just say since we had testimony stating that

21   there are leases or rather financial relationships

22   between the doctor and all of the referring doctors

23   in this matter, in other words, that there is some

24   sort of lease agreement between the doctor,

25   Dr. Matrongolo, and all the providers referred

3

1    services to Dr. Matrongolo, and that 238A requires a
2    written lease.  If they're stating they don't have a
3    written lease, they're in violation of the Public
4    Health Law and, therefore, it's clear that they can't
5    sustain their case.
6              MR. VIVERITO:  I would dispute that, your
7    Honor, if I may.
8              THE COURT:  Yeah, because?
9              MR. VIVERITO:  I was hoping to save this
10   kind of for collective argument as to why I don't
11   think we should even get, on any of the cases, to a
12   determination of whether we comply with any
13   requirement of the statute.  We're skipping a very
14   vital step.  That is a simple demonstration
15   undertaken by defendant to demonstrate to this Court
16   in a formal setting how the statute applies to the
17   facts of our cases.  Now, the statute that the
18   defendant invokes, because defendant is invoking
19   statute, should be incumbent upon the defendant to
20   demonstrate how it applies.  The statute is very
21   specific as to the type of practitioners and the type
22   of medical services to be covered by the statute.
23   For example, X-ray services, ultrasound, imaging
24   services like MRIs.
25             The type of services that are featured in

4

1   these cases have been known to the defendant since
2   way back during the E.U.O. and E.B.T. of Dr.
3   Matrangolo himself, in '07 and '08, and I'd like to
4   point out quickly that that's contemporaneous with
5   most of the cases before you today, three out of the
6   four cases today are 2008 dates of service. He's
7   asked the direct question, I'm not going to say what
8   he says, but he describes what the medical services
9   are, he describes four different types of services.
10  I can say what they are, but I won't at the moment.

11           If this were an X-ray case we could say
12  definitively without any kind of leg work, well,
13  X-rays is listed right in the statute, of course the
14  statute applies to our set of facts or if it was an
15  MRI case or ultrasound case because it's specifically
16  delineated.  But here the types of services aren't
17  the type that are automatically associated with those
18  listed in the statute.  I want to bring up very
19  briefly a case that defendant inserts into its own
20  trial memo, the Carolyn Wade case of Kings County
21  where she ruled that plaintiff did violate 238A.  But
22  before she got to that part, the Court had to, as I
23  understand it, make certain that the services at
24  issue in that case are the type to be governed by the
25  statute.  And since the ultrasound was the subject of

5

1    the referral, they can easily associate that with the

2    ultrasonography listed in the statute.  Our services,

3    again, are a little bit -- aren't as obvious and

4    aren't as clearly delineated with some other types of

5    services.

6              MR. PULEO:  The witness should be excused

7    rather than be coached on the stand while counsel

8    makes his legal argument, which is completely out of

9    order at this point.

10             THE COURT:  She's just being called for

11   leases.  Just finish that and we'll get to that, your

12   next issue.  That's it.  Finish.

13             First of all, just let me mark them as a

14   Court exhibit.  I have Court Exhibit 2.

15             MR. PULEO:  This is the only one that

16   should be marked for identification.

17             THE COURT:  This is Court Exhibit number 3.

18   Well, let's mark this -- let's mark it Defendant's A

19   in evidence.  1426 Victory Boulevard, Staten Island,

20   New York, lease for the premises, and that's in

21   evidence.

22             And you could not find a lease, is that

23   right, I'm asking the witness now, who remains under

24   oath, you did not find a lease for 3010 Amboy Road in

25   Staten Island?

6

1    THE WITNESS: That was the one that was

2    missing, yes.

3    THE COURT: And who conducted the search?

4    THE WITNESS: I did and one of the other

5    workers.

6    THE COURT: Okay. And where did you

7    search?

8    THE WITNESS: Wherever we could look.

9    THE COURT: Okay. What about

10   Dr. Matrongolo, did you look anywhere?

11   THE WITNESS: We barely keep those reports.

12   He doesn't hold onto those copies, we have them, so

13   we would be the ones that would have them.

14   THE COURT: Okay. And anyone else other

15   than yourself and this other worker conduct a search?

16   THE WITNESS: No.

17   THE COURT: Okay. Now, go ahead, want to

18   ask her about this lease?

19   DIRECT EXAMINATION

20   BY MR. PULEO:

21   Q    Let me just give you the lease. Was this the

22   lease that was in affect in October 2008 when the services

23   at issue were rendered?

24   A    Yes, this was from 1/1 of '08 to 12/31 of '08.

25   Q    And who drafted or prepared that lease?

7

M. Ingrassia-Direct/Puleo

1    A    Not really sure.

2    Q    Are all the leases for the various referring
3    providers the same except for the location and the amount
4    of rent paid?  In other words, are the terms of the leases
5    all identical?

6    A    They should be.  I'm not really sure.

7    Q    Does that suggest to you that Dr. Matrongolo or
8    someone on his behalf prepared all the leases and gave
9    them to the various referring providers to sign?

10    A    I'm not sure who did them in the beginning.  I
11    done the later ones, but I'm not sure.

12    Q    Do some of the leases contain stamped signatures
13    as opposed to actual signatures?

14    A    Some might, yes.

15    Q    This one has an actual signature on it?

16    A    Yes.

17    Q    Do you know what, if any, negotiations took
18    place for this particular lease?

19    A    No, I'm not aware of any of the negotiations,
20    no.

21    Q    Do you know how this particular rental figure of
22    2400-dollars a year was arrived at?

23    A    It's arrived at through the two doctors with the
24    fair market value.

25    Q    Do you know that or is that your speculation?

8

M. Ingrassia-Direct/Puleo

1    A    That's what I'm told.

2    Q    Who told you that?

3    A    The doctors.

4              MR. PULEO:  I'll object and move to strike

5    as hearsay.

6              THE COURT:  You're the one who asked.

7              MR. PULEO:  I move to strike the answer.

8              THE COURT:  Who told you was a hearsay

9    question.  You asked it.  That's the way it goes.

10   Don't ask the question then.

11   Q    Do you have any personal knowledge of how the

12   rent was calculated or what it was based on?

13   A    No, I don't.

14             MR. PULEO:  I have no further questions.

15             THE COURT:  Any questions, Counsel?

16             MR. VIVERITO:  Yes, please, your Honor.

17   CROSS EXAMINATION

18   BY MR. VIVERITO:

19   Q    Ms. Ingrassia, were you employed by Dr. Stephen

20   Matrangolo in 2008 and 2009?

21   A    Yes.

22   Q    And isn't it true that part of your duties --

23   strike that.  During those times what was your job title?

24   A    Office manager.

25   Q    Office manager.  And what are -- isn't it true

9

M. Ingrassia-Cross/Viverito

1   that as part of your duties as office manager was to keep

2   track of the payment of rent as noted in these leases?

3        A    I was responsible for making sure that they were

4   paid each month.

5        Q    And tell us how you went about doing that

6   please?

7        A    We keep a record in the office.  It's in the

8   computer and the doctor would give us the checks and we

9   would mail them out.

10       Q    So, you are in charge of making sure that

11  payments go to the referring doctors' locations from

12  Stephen Matrongolo?

13       A    I mail the checks out, yes.

14       Q    Okay.  Now, are there any other payments made by

15  Dr. Stephen Matrongolo?  In your position as office

16  manager, I'm asking if you have knowledge of this, are

17  there any other payments made by Dr. Stephen Matrongolo to

18  any of the referring doctors or their locations, other

19  than the rent that is stated for instance on that lease

20  before you?

21       A    No, it's just the rent check.

22       Q    Nothing else?

23       A    No.

24       Q    No other payments of any kind?

25       A    No.

10

M. Ingrassia-Cross/Viverito

1    Q    For supplies?

2    A    No.

3    Q    For utilities?

4    A    No.

5    Q    Okay.  Isn't it true that there's a section in

6    the lease before you called utilities?

7    A    Yes, section four.

8    Q    Section four.  And isn't it true that the lessor

9    is going to provide --

10            MR. PULEO:  Object to her interpreting the

11        lease, Judge.

12            THE COURT:  Sustained.  I'll read the

13        provisions if you want.  You can talk to me about

14        that or tell me what is it after you complete your

15        questioning or she can read it to herself.

16            MR. VIVERITO:  This lease is in evidence,

17        correct?

18            THE COURT:  Yeah.

19    Q    Okay.  Could you please read number four for us?

20    A    "Utilities.  Lessor shall provide all utilities

21    to the premises including electricity, gas, water, air

22    condition and heat in accordance with the seasonal needs

23    of the Lessee and Lessee's employees and invitees.  Lessor

24    will provide secretarial staff, use of utilities,

25    telephones, fax, copier machines and supplies."

11

M. Ingrassia-Cross/Viverito

1    Q    Okay.  And how long is the term of the lease

2    before you?

3    A    One year.

4    Q    And isn't it true that the paragraph one states

5    that rent it is to be paid in equal installments of $1,000

6    a month?

7         MR. PULEO:  Objection, your Honor, leading

8    the witness.

9         MR. VIVERITO:  I'm just asking.

10        MR. PULEO:  It's a false statement to begin

11    with.

12        THE COURT:  All you have to do, what

13    paragraph do you want her to read, please?

14        MR. VIVERITO:  Number one.

15        THE WITNESS:  This is for Dr. Demartinis.

16        THE COURT:  Hold on just a moment.

17    Q    If you can, just read paragraph one of the lease

18    before you.  Ms. Ingrassia, would you please read

19    paragraph one on the lease before you?

20    A    "Term and Rent.  Lessor demises the above

21    premises for a term of one year, Commencing 1/1/08 and

22    terminating 12/31/08, or sooner as provided herein at the

23    annual rental of $2,400 payable in equal installments of

24    $200 due monthly.  The first month's rent shall become due

25    and payable on a prorated basis as of the date that the

M. Ingrassia-Cross/Viverito

1    lessee receives the necessary licenses and/or permits for

2    the use of the premises as described herein below.  All

3    rental payment shall be made to the Lessor at the above

4    specified above."

5         Q    And number 2 please?

6         A    "Use.  Lessee shall use and occupy the premises

7    for diagnostic testing.  The Lessee will provide all

8    equipment necessary.  The premises shall be used for no

9    other purpose.  Lessor represents that the premises may

10   lawfully be used for such a purpose."

11        Q    Okay.  Thank you.  And in your history as office

12   manager back in 2008 and 2009, was there ever a time when

13   a payment was issued from Dr. Matrongolo to the referring

14   doctor at that location that was any different than the

15   rent listed on the lease?

16        A    No, it's only the rent check.

17             MR. VIVERITO:  I have nothing further at

18        this time.

19   REDIRECT EXAMINATION

20   BY MR. PULEO:

21        Q    Ms. Ingrassia, you read a portion of the lease

22   that says lessor demises the above premises.  Was the

23   entire premises leased out to Dr. Matrongolo?

24        A    No.

25        Q    Just a part of the premises?

13

M. Ingrassia-Redirect/Puleo

1    A    Right.

2    Q    Does the lease specify what part of the

3    premises?

4    A    No.

5    Q    And the diagnostic testing, that's the type of

6    testing that was done on this patient in October of 2008,

7    correct?

8    A    Correct.

9              MR. PULEO:  I have no further questions.

10             MR. VIVERITO:  I have nothing further at

11        this time.

12             THE COURT:  Okay.  Thank you.  I'll take

13        that.  All right.  All right.  Now, you have no lease

14        for the other case.  Now, go ahead, let's hear it.

15        What do you have to say about this?  Do you have any

16        other witnesses or is that it?

17             MR. PULEO:  No, I have no further

18        witnesses, Judge.

19             THE COURT:  No further witnesses.

20             Okay.  Now, you get to the issue of -- you

21        rest, that's it?

22             MR. PULEO:  Yes, I rest.

23             THE COURT:  So, now, you get to the issue

24        of whether or not the plaintiff has the last word to

25        make, so let me hear it from the defendant first, why

14

Proceedings

1    do you think that this action should be dismissed?

2    First, deal with the issue of were the services

3    provided within the meaning of the statute that you

4    wish to avail yourself of by saying that there was a

5    financial arrangement between the provider of

6    services and the referrer of services.  Excuse me,

7    yeah, the referrer of such services.  So, tell me

8    again, with respect to Fanelli, first with the issue

9    of Fanelli.

10            MR. PULEO:  I don't think there's been any

11   evidence on Fanelli because we just started that case

12   thirty seconds ago.

13            THE COURT:  Okay.  Tell me on Infuso, what

14   on that case exactly what it is that what were the

15   services that were provided?

16            MR. PULEO:  The services that were

17   provided --

18            THE COURT:  Or billed for.

19            MR. PULEO:  Or billed for were the

20   neuromuscular testing under codes 95999 and 95904,

21   which I believe is a current perception threshold

22   test as testified to by whenever Ms. Ingrassia

23   testified last that these are diagnostic tests.

24            I would refer the Court to two things.

25   Number one, paragraph 13 of my trial memo, where I

15

Proceedings

1   specifically address the fact that the section

2   applies to physical therapy services.  Plaintiff's

3   counsel has repeatedly tried to misdirect the Court

4   by talking about ultrasound and X-ray imaging,

5   forgetting of course that the statute --

6           THE COURT:  Okay.  So let's look.  You said

7   section 238A prohibits self referrals specifically

8   applicable to physical therapy which are broadly

9   defined in section 6731A of the New York State

10  Education Law.  Now, it's says include the type of

11  test by plaintiff.  Who's got a copy of 6731 of the

12  New York State Education Law?

13          MR. PULEO:  I have that, Judge.

14          THE COURT:  All right.  So, let's take a

15  look at that and see where neuromuscular testing --

16          MR. PULEO:  It is diagnostic testing.  I

17  got it here.

18          THE COURT:  Okay.  So, just a minute, let

19  me read it.

20          MR. PULEO:  It will be the first paragraph.

21          THE COURT:  First paragraph says, "The

22  evaluation, treatment or prevention of disability,

23  injury, disease, or other condition of health using

24  physical, chemical, and mechanical means including,

25  but not limited to heat, cold, light, air, water,

16

Proceedings

1    sound, electricity, massage, mobilization, and

2    therapeutic exercise with or without assistive

3    devices, and the performance and interpretation of

4    tests and measurements to assess pathophysiological,

5    pathomechanical, and developmental deficits of human

6    systems to determine treatment, and assist in

7    diagnosis and prognosis." Okay. And that's the

8    definition of physical therapy.

9         Okay. And what you're saying is that these

10   two tests are in connection with the assessment and

11   measurements to assess the pathophysiological --

12        MR. PULEO:  The performance and

13   interpretation of tests and measurements.

14        THE COURT:  Okay.  Okay.

15        MR. PULEO:  And I respectfully refer the

16   Court to the cases in my trial memo from Judge

17   Engoron.  Particularly, Judge Moulton who

18   specifically said that these types of test

19   specifically apply to the type of physical therapy

20   services that are subject of the bills herein in his

21   decision, which involved, I think, two of the same

22   codes.  And we have, somewhere in this pile of paper,

23   the actual bills that Judge Moulton reviewed in

24   arriving at the decision.  They are the same Workers'

25   Compensation fee schedule codes for neuromuscular

17

Proceedings

1   testing and for current reception threshold test.

2           THE COURT:  Over to you, Counsel, what do

3   you have to say about that?

4           MR. VIVERITO:  First of all I object to

5   defendant trying to establish his defense through

6   another case.  We don't know for instance what

7   defendant presented in that case and --

8           THE COURT:  Are you a party in that case?

9           MR. VIVERITO:  No, I don't believe I was, I

10  didn't appear on that case.

11          THE COURT:  Dr. Matrongolo a party in the

12  case?

13          MR. VIVERITO:  Yes, I believe so.

14          THE COURT:  There you go.

15          MR. VIVERITO:  Might have been

16  Dr. Felderstein case.

17          MR. PULEO:  No, Matrongolo case.

18          THE COURT:  Next.  Part of your big

19  argument, as I see it throughout this, is that you're

20  talking about how this statute does not apply to this

21  situation because the tests that were administered do

22  not come under the disqualification.  In other words,

23  they're not applicable to the preclusion of a

24  financial relationship.  That's your argument, right?

25          MR. VIVERITO:  That's one of my arguments,

18
Proceedings

1    yes.

2            THE COURT:  So, tell me why.

3            MR. VIVERITO:  You know, I just want to

4    adjust the argument a little bit, it's not that I'm

5    saying that the tests aren't necessarily applicable,

6    I'm just saying that if the defendant is the one

7    invoking the statute, it needs to make a formal

8    demonstration of the applicability of the statute,

9    especially when we're talking about types of services

10   that aren't easily ascertainable by a lay person.  If

11   we're talking about neuromuscular testing, I would

12   also think you would need a medical expert to say,

13   well, I reviewed these test results, I know these

14   tests to be X, Y, Z, and I know from my years of

15   experience of classifying and coding certain medical

16   services that these services fall under for

17   instance --

18           THE COURT:  I got your argument.

19           MR. VIVERITO:  That hasn't been done and

20   that's lacking here because we're jumping right to

21   whether we comport with the requirement of the

22   statute.

23           THE COURT:  Next argument which is?

24           MR. VIVERITO:  My next argument is that --

25   and I have the two other lease agreements, the

19

Proceedings

1  original ones for the two other cases that we haven't

2  gotten to yet, and I want to say that if we go line

3  by line by the Safe Harbor provisions in the statute,

4  from the testimony of Ms. Ingrassia, the only payment

5  made by Dr. Matrangolo to any of the referring

6  doctors is the rent and that payment is always

7  consistent with the rent listed on the lease.

8          THE COURT:  But you know that there are

9  cases that say that the burden of proof once

10  establishing a financial relationship the burden of

11  proof is to prove fair market value shifts back over

12  to the plaintiff.  Do you think that's not the proper

13  interpretation of what should go on in these trials?

14          MR. VIVERITO:  I do in a sense, your Honor.

15  I think that what was the whole purpose of like

16  exchanging discovery for the last two years and

17  subpoenaing witnesses, if basically what defendant is

18  going to do in Court, just to come into Court and

19  say, you go, you prove everything, you prove why

20  you're entitled to X, Y, Z, what was the whole point

21  of exchanging materials?  Defendant has been in

22  possession of all the materials since 2010, albeit

23  copies, that's what they were asking for and they sit

24  there are and do nothing with it.

25          THE COURT:  They did something, they found

22

Proceedings

1    object, Judge.

2              MR. PULEO:  I object.

3              THE COURT:  Now, let's move on.

4              Do you have any case laws that shifts the

5    burden or keeps the burden on the defendant to come

6    forth with proof, affirmative proof, that fair market

7    value has to be established -- or the lack of fair

8    market value has to be established by the defendants?

9    If you have a case that tells me that the fair market

10   value must be established as part of the defendant's

11   case, then that I can read.  Otherwise, the only

12   things I'm reading says the burden shifts back to the

13   plaintiff to say that it's fair market value.  Do you

14   have a case?

15             MR. VIVERITO:  I don't, your Honor, but I

16   want speak to what you just said.  You said if we say

17   fair market value, and we did in two depositions,

18   wait a second, we did in two depositions, when that

19   question was directly asked, how do you decide on the

20   rent for your various leases?

21             THE COURT:  Fair market value is not

22   established by the parties.  The fair market value is

23   established by the use of an expert witness, the use

24   of a realtor or other leases inside the building.

25   It's not an answer to say did you negotiate the

23

Proceedings

1  lease, but that burden is on you to come back on your

2  side of the case then, you know, to the extent that

3  you're permitted to use a deposition, which I don't

4  think you'll be able to in this case, certainly not

5  Dr. Matrongolo when he hasn't appeared.

6           MR. VIVERITO:  It's monumentally unfair to

7  say that I need to present live witness testimony on

8  the issue of fair market value, if you're not going

9  to demand the same of defendant.

10          THE COURT:  I haven't said anything about

11  that.

12          MR. VIVERITO:  I don't have a case on that.

13          THE COURT:  You don't have any case that

14  says the burden is shifted over to you?

15          Now, let's move on.

16          MR. VIVERITO:  I have evidence of fair

17  market value before me.  I have evidence of what fair

18  market value is in the region.

19          THE COURT:  If you want to go back into

20  your rebuttal, then we're not having closing argument

21  here, you want to present evidence saying that this

22  is fair market value that's something else entirely.

23          MR. VIVERITO:  Just for the Court's

24  edification.

25          THE COURT:  It's not edification.  It's

24
Proceedings

1    part of your case.  The case is over.  I'm listening

2    to closing argument.  If you're going to present

3    additional evidence, then we went a bit out of whack,

4    but I'll come back over to you and you'll put in your

5    rebuttal evidence to the extent it's admissible.

6              MR. VIVERITO:  All I have here is that --

7    this is what I could come up with, as far as the

8    lease of office spaces for doctors in the Staten

9    Island area, and I found that, you know, where a

10   thousand square feet is concerned --

11             THE COURT:  You can't put that in.  You're

12   not an expert.  I'll mark it for identification.

13   It's totally hearsay.  You can't cross examine it.

14   You don't know where it came from.  If you want, I'll

15   mark it as Plaintiff's 1 for identification.

16             MR. VIVERITO:  It does give some indication

17   that our leases of not out of the scope of what fair

18   market value is.

19             THE COURT:  That's called Plaintiff's 1 for

20   I.D., that's it, from like an office search.

21             MR. VIVERITO:  From the internet.

22             THE COURT:  Conducted on 12/19/2011.  I

23   believe the services were rendered when?

24             MR. PULEO:  2008.

25             THE COURT:  So, in any event, this wouldn't

25
Proceedings

1   be relevant because what is '11 compared to what is
2   2008 is something else.  So, this is Plaintiff's 1
3   for identification.  Not into evidence.
4        Okay.  Now, tell me what neuromuscular
5   testing code 95999, why you don't think that fits
6   into the category of testing that is under the New
7   York State Education Department Law.  I mean, yeah,
8   why it is that that is not considered to be, if you
9   know, measurements to assess pathophysiological and
10   pathomechanical and developmental deficits of human
11   systems?
12        MR. VIVERITO:  Your Honor, that's my whole
13   point, I don't need to make that determination one
14   way or the other.  I'm saying that the defendant
15   invokes the statute.  It's incumbent upon the
16   defendant to demonstrate to this Court why
17   neuromuscular testing does apply to the statute that
18   they're invoking.  I don't have to prove why it
19   doesn't.
20        THE COURT:  I got your point.
21        Now, let's go back over to you for a
22   moment.  Did anyone define what neuromuscular testing
23   is?  What is neuro --
24        MR. PULEO:  Well, the witness called it a
25   diagnostic test.  The lease calls it a diagnostic

26

Proceedings

1   test.

2           MR. VIVERITO:  A lay person with no medical

3   training.

4           MR. PULEO:  Judge Engoron and Judge Healy

5   all found these specific testings to be within the

6   scope of the statute.  Matter of fact, what I have --

7           THE COURT:  Just tell me, what is

8   neuromuscular testing?  What does it mean when

9   something is pathophysiological?

10          MR. PULEO:  Pathology is pathology.

11          MR. VIVERITO:  Objection.  Defendant is

12  trying to characterize our medical services without

13  an expert witness to carry that out.

14          THE COURT:  I'm just asking about whether

15  or not there's a layman's interpretation of that that

16  I can figure it out for myself without the use of

17  expert people about whether neuromuscular testing

18  falls in this category.

19          MR. PULEO:  It's a diagnostic test by their

20  own admission.

21          MR. VIVERITO:  By whose admission?  An

22  office manager's admission?  They don't have medical

23  training.

24          MR. PULEO:  By the Workers' Compensation

25  code as well, which I'll offer into evidence as the

27

Proceedings

definition of those tests.

MR. VIVERITO: I object to the admission of that.

THE COURT: I can take judicial notice of the statute. I don't need to have that in evidence. Let me see and see if it sheds light on what neuromuscular testing is. Code 95999. Unlisted neurological or neuromuscular diagnostic procedure. And 95904?

MR. PULEO: You have to read that in conjunction with 95900 and 95904 is a sensory nerve version of that test.

THE COURT: Says nerve conduction amplitude latency velocity studies of each nerve without F wave study. 95093 is a procedure with F wave study. And 95904 is sensory.

MR. VIVERITO: Your Honor, the statute is chalk full definitions of the various medical services. I don't find those terms in there. I'm just saying that would necessitate the appearance of someone who is an expert, whether it's a coder or a medical doctor.

THE COURT: All right. So, anything else you want present with respect to this case, 12997?

MR. PULEO: I'd also offer to the Court as

28

Proceedings

1    an exhibit, Judge Moulton's decision, along with a

2    copy of the complaint in that action, which annexed

3    the various bills at issue in that action, in which

4    Judge Moulton found specifically fit the definition

5    of physical therapy services under the statute, and

6    as you can see there were three different Workers'

7    Compensation codes that apply to that case.  Two of

8    them are the same as the case at issue here.

9             And Judge Engoron and I think Judge Healy

10   similarly found that the services rendered by

11   Dr. Matrangolo were within the scope of the statute.

12            MR. VIVERITO:  Your Honor, when you're

13   talking about making a demonstration for the Court,

14   if you're invoking a statute, you know, it doesn't

15   matter what happened in another trial, you still have

16   to make that determination.  There has been no motion

17   to consolidate these matters with other Dr.

18   Matrangolo matters.  Who's to say what kind of

19   demonstration defendant made in that case.  But if

20   there was no demonstration made, with all respect, it

21   was inappropriate for any Judge to assume that the

22   statute applies without an actual formal

23   demonstration, given the fact that the testing is of

24   such a nature that it is impossible to just say, oh,

25   xray services, boom, there it is.  It takes more

29
Proceedings

1    effort than that and more work.  I'm not sure whether

2    the statute applies and defendant is not

3    demonstrating that and is jumping ahead to putting us

4    against the wall to demonstrate X, Y, Z.

5              MR. PULEO:  I don't know how much more

6    specific I can demonstrate it by showing several

7    cases involving the same parties and the same tests

8    which have been specifically found to be within the

9    statute.  That's collateral estoppel.

10             THE COURT:  This action here, I'm

11   dismissing this action.  It's dismissed.  I'm finding

12   that there was a financial relationship.  I'm finding

13   the testing involved comes under the applicability of

14   238A and for those reasons the case is dismissed with

15   prejudice.

16             I don't think I need neuromuscular testing

17   and the performance and interpretation of tests and

18   measurements to assess pathophysiological,

19   pathomechanical, and developmental deficits of human

20   systems to determine treatment, and assist in

21   diagnosis and prognosis.  I think I'm sufficiently

22   intelligent, even as a layman, to know that's what

23   that is.  So, that's my determination.  You can take

24   it up with the Appellate Term.

25             MR. VIVERITO:  Note my exception, your

21
                              Proceedings

1    that a misinterpretation or wrongful interpretation

2    of the burden of proof in these cases?

3              MR. VIVERITO:  Well, it is when you

4    consider the defendant presents no evidence as to an

5    analysis of what's happening here.  If the defendant

6    wants to claim a deviation, shouldn't it present some

7    kind of theory?

8              THE COURT:  All they have to do is say you

9    have an economic relationship.  They've met that

10   burden.  Is it wrong?  Is their view wrong on the law

11   that then the burden of proof shifts back to the

12   plaintiff when they want to invoke the Safe Harbor

13   provision, doesn't that burden then fall on you to

14   show that this is a bona fide lease at a fair market

15   value?  That's a wrong recitation of the law.

16             MR. VIVERITO:  First of all, on the side

17   that it's not wrong, I'm going to say that through

18   two depositions when our client was -- don't

19   interrupt me.

20             MR. PULEO:  I object.  The document is not

21   in evidence.

22             THE COURT:  You're getting too agitated.

23             MR. PULEO:  You're not a sworn witness

24   giving testimony.

25             THE COURT:  All you have to say is I

44

Proceedings

1      Okay.  Thank you.

2                  MR. O'DONNELL:  Can you say that again?

3                  (Matter adjourned.)

4              REPORTER'S CERTIFICATION

5              Certified to be a true and accurate

6      transcript of the original stenographic notes.

7

8      -----------------------------------------------

9

10                 DeWAYNE SCHMIDT

11             OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20

Proceedings

1    out that you have a financial relationship with the

2    referring provider.  That's why you have the leases

3    exchanged.  So, that's why they need to that do.

4              MR. VIVERITO:  They needed to conduct an

5    EBT and EUO, right.  But my point is the -- let me

6    just back up for a second.  If you're not even going

7    to present a theory as to where you think the

8    malfeasance lies, again, have some theories for us,

9    your Honor, for the Court, I'm saying that I have

10   looked at these leases and I think this rent is

11   astronomically high and low.  Where is the theory of

12   the maleficence?

13             THE COURT:  You're trying to change the

14   burden of proof that shifts back over to you.  Their

15   prima facia case of an economic relationship which is

16   prohibited and they have shown the economic

17   relationship, the burden then shifts back over to the

18   plaintiff to say now it's fair market value.  Do you

19   think that's wrong?  You can say it's wrong because

20   you don't believe in it, but I mean is it wrong

21   because it's just the wrong recitation of the burden

22   of proof?

23             MR. VIVERITO:  I think it's wrong in the

24   sense that --

25             THE COURT:  I just want to know how, is

30
Proceedings

1   Honor.

2       THE COURT:  I know.  So, it's dismissed

3   with prejudice.  Okay.  That's that one.  Let's get

4   to the next one.

5       MR. VIVERITO:  All I have is these two

6   other leases for the two other premises.

7       THE COURT:  Let's talk about the one where

8   you don't have the lease.  Now, let's get to that

9   one.  Index number 50716.  That's for the Amboy

10  Avenue location.  You have a financial relationship

11  which she testified to.  You have to have a lease.

12  If you want to fall under the exception, you're

13  supposed to produce a lease.  You haven't produced a

14  lease.  And, actually, you really haven't explained a

15  sufficient explanation as to the search for the

16  lease.  There might be an office manager or someone

17  else, Dr. Matrongolo, who's a party on the lease, say

18  that he even conducted a search for the lease.

19      MR. VIVERITO:  The reason why we don't have

20  him here is because he wasn't properly subpoenaed.

21  That's why he's not here.

22      THE COURT:  You needed to produce the lease

23  in evidence.  Produce the lease.  That would be a

24  good thing to do, to say that he searched for it and

25  couldn't produce the lease.  That would be a good

31
Proceedings

1    thing to do.  But, you know, he's not here, you don't

2    have the lease.

3                Now, services, let's get to the issue of

4    whether those services come under the statute.  What

5    services were provided in this case?

6                MR. O'DONNELL:  I have copies of the

7    summons and complaint in this matter.  The bill is

8    attached to the summons and complaint.

9                THE COURT:  What is that called?

10               MR. O'DONNELL:  That's the neurological

11   procedure that was shown to the Court in the last

12   matter.

13               THE COURT:  Anything else, other than that?

14               MR. O'DONNELL:  I believe that's the only

15   bill.

16               THE COURT:  All right.  My same holdings

17   then.  And I do think the statute applies.  I do

18   think it comes under the New York State Education Law

19   6731.  I think other judges have found that too.  And

20   there's no lease, which they're entitled to have, and

21   there's been no rebuttal, in any event, even in the

22   absence of a lease, as to the fair market value.  So,

23   this case is dismissed with prejudice.

24               THE COURT:  Gertina Jackson now.  Did you

25   get the original?

32

Proceedings

1          MR. O'DONNELL:  Here's the original lease.

2          THE COURT:  Original lease.  Okay.  So

3    that's going to be deemed marked as Defendant's A in

4    evidence.  Original lease.  Have you examined it

5    against the copies you received?

6          MR. O'DONNELL:  That's what I'm doing right

7    now and it should match up.  Just want to make sure

8    we got the dates of service right.  September, 2008.

9    Okay.  September, 2008.  So that would fall within

10   the scope of this one.

11         THE COURT:  So, I'll just mark the back of

12   it.  I'll call it Defendant's A in evidence.

13         Now, on this one, you have a stipulation of

14   facts as to the -- as to the claims being submitted,

15   the claims being denied, you know, everything except

16   the issue of whether or not there's a financial

17   relationship between the parties?  Are you

18   stipulating to any of that?

19         MR. VIVERITO:  I'm stipulating to

20   everything except there's applicability of the facts

21   and financial relationship.

22         THE COURT:  So, this is 1955 Merrick Road

23   and the services that were provided you stipulated or

24   billed for?

25         MR. VIVERITO:  Are also code 95999.

33
Proceedings

1    THE COURT:  With respect to -- we have the

2    economic relationship established by the lease.  And

3    your argument, you want to just make a record again

4    on that, about the argument that 95999 should not

5    apply to the New York State Education Law and

6    therefore not apply to section 238 of the Public

7    Health Law.

8    MR. VIVERITO:  That's not exactly what I

9    want to argue.  I want to argue that it's not our

10   objective to make the determination.  I don't know

11   whether they apply or not.  But since it's the

12   defendant that invokes the statute, it should be a

13   fundamental premise when you get to Court to make a

14   formal demonstration with admissible evidence that

15   the testing featured in our cases is applicable to

16   the testing in the statute.

17        Now, what I find very kind of confusing and

18   perplexing about these proceedings, while I may have

19   been required to make that kind of formal

20   demonstration with admissible evidence and maybe even

21   an actual witness who might possess fair market

22   knowledge, defendant however is not put to that test

23   of doing anything but presenting materials for your

24   Honor to interpret.  I don't think it's the court's

25   job to make those kind of interpretations or those

34

Proceedings

1    kinds of demonstrations.  That's defendant's job.

2    They're the one invoking the statute.  They glossed

3    over that part of the equation.  They want to jump

4    right to putting us against the wall to make a

5    demonstration of everything under the sun and I think

6    it's totally, completely backwards is what their

7    burden should be, and they haven't even presented one

8    piece of admissible evidence to connect the services

9    in our case to the statute.

10              THE COURT:  You think that a layman, even

11   as myself, and just in reading the statute, the

12   physical medical fee schedule under the Workers'

13   Compensation Law, coupled with the Public Health Law

14   is sufficiently simple enough for me to determine

15   that those would come under -- that 95999 comes under

16   the definition of pathophysiological and

17   pathomechanical and developmental deficits of human

18   system, that that's sufficiently clear that I can

19   make that determination without the use of medical

20   testimony?

21              MR. VIVERITO:  No, I don't, your Honor.

22              THE COURT:  Not you, I'm asking defendant.

23   Does he think that that is sufficiently clear for the

24   description of the test, coupled with the perusal of

25   the definition of physical therapy as defined in the

Proceedings

1    Education Law is sufficient enough without the use of

2    medical testimony, is that what your view is?

3                MR. O'DONNELL:  I believe that the statute

4    is self evident that it encompasses the type of

5    diagnostic tests, self-proclaimed diagnostic tests

6    that the plaintiff has rendered in this case, and in

7    the other cases that have come before the various

8    courts, all of whom have found that these services

9    fit within that definition of physical therapy

10   services.

11               MR. VIVERITO:  Your Honor, I'm asking the

12   Court to use the same common sense in connecting the

13   dots in that forum.  Then I would ask the Court to

14   use the same logic and look at an amount as recorded

15   on a lease and make a common sense determination of

16   fair market value and if it does, how does it do it.

17   And we're just twisting in the wind here.  I just

18   think that if we're going to use common sense in one

19   area, we should use it in another or not all and hold

20   everybody to the same standard.  I shouldn't be

21   forced to demonstrate fair market value to the black

22   T, if they're not held to the same requirement with

23   regard to demonstrating applicability with live

24   testimony, your Honor.

25               THE COURT:  Okay.  You know what I'm going

36
Proceedings

1   to do in all of these cases, I'm going to leave the

2   door open for you.  If for some reason my common

3   sense or my ability to read or interpret this

4   language in Workers' Compensation or under the

5   Education Law is so wrong and you come forth with

6   some affidavit that says that these neuromuscular

7   tests, neurological and neuromuscular diagnostic

8   procedures are not made in connection with testing

9   and measuring pathophysiological or pathomechanical

10  deficits, then I will reconsider my decision.

11          If it falls under some other category or

12  that my application of the reading and common sense

13  under the statute is so wrong, I will open the

14  opportunity to you, if you do so within the next 30

15  days, to come to Court and show me that I have

16  misinterpreted the words pathophysiological,

17  pathomechanical, as it applies to measurements or

18  tests of the neurological or neuromuscular diagnostic

19  procedures about which this case is, because I don't

20  think I have to necessarily be a medical expert and

21  maybe I'm too haughty about my own skills in reading.

22  So, I will keep that opportunity open to you.

23          MR. O'DONNELL:  I can't cross examine on

24  that.

25          THE COURT:  I know you can't, but then I

37
Proceedings

1    will open it up and I what I might do is and actually

2    if someone has the nerve to put that inside an

3    affidavit, I might actually reconsider the

4    possibility that my layman's understanding of those

5    words might be wrong, then I might ask you to reopen

6    this case and you'll bring in your doctor to say that

7    that is a classic neuromuscular and then everyone

8    will put in their affidavits and their testimony and

9    go in front of whatever boards they have, if that's

10   so wrong, I give you the possibility that it's so

11   wrong, someone will have to sign an affidavit as a

12   doctor to say that that's not a test of the --

13   neuromuscular diagnostic procedure is not a test of

14   your pathophysiological system.

15           MR. VIVERITO:  Thank you very much, your

16   Honor, for that.  I just want to make it clear that

17   that doesn't change my argument that it's defendant's

18   objective to make that determination.

19           THE COURT:  I think that's sufficient.  I

20   think the window of opportunity, if you think it

21   exists, and if someone is willing to sign an

22   affidavit that says that, and they're a doctor, and I

23   mean a doctor that does this type of medicine, not

24   just, you know, I mean --

25           MR. VIVERITO:  Our client?

Proceedings

1      THE COURT: Well, I mean, you know, if it's

2   your client, that's says, oh, no, and he says what it

3   is, that it is, and what it is defined as a test of,

4   and he explains why it is not a pathophysiological or

5   pathomechanical test, then I will think about that,

6   not just come to a conclusion that it is not a

7   pathophysiological test in my medical opinion, he'll

8   have to say why it is and what it is, and if

9   someone's willing to put that in writing and sign

10  their name to it and swear on it, then I will

11  consider the possibility that I have, as not an M.D,

12  misread the statute, but that's what you're going to

13  have to do in the motion in the next 30 days to

14  reargue or renew and I'm giving you that opportunity

15  only in the next 30 days.

16      MR. O'DONNELL: Now, your Honor, do --

17      THE COURT: That's dismissed with

18  prejudice. This action is dismissed with prejudice

19  for all the reasons I state on the record.

20      MR. PULEO: My understanding is that motion

21  must be filed within 30 days?

22      THE COURT: Has to be served. Just served

23  within 30 days with the attached affidavit on all of

24  those cases that I have just done because. I can be

25  wrong at times, even on a Matrangolo case, which I

39

Proceedings

1    believe I was at one point.

2              MR. VIVERITO:  May I get a copy?

3              THE COURT:  They're part of the Workers'

4    Compensation Statute fee schedule on the Workers'

5    Compensation Statute and it's McKinney's Education

6    Law, Section 6731.

7              THE COURT:  Okay.  So, now we go to this

8    case and you have the stipulation as to the services

9    that were provided, that the bills were sent, and

10   they were denied.  The only issues are the economic

11   relationship between the provider, Dr. Matrangolo,

12   and the referring physician, and let's start with

13   what is the code for the tests that were performed?

14             MR. VIVERITO:  95999.

15             THE COURT:  Okay.  And with respect to the

16   lease, is the lease here for that location?

17             MR. VIVERITO:  Yes, your Honor.

18             MR. O'DONNELL:  Yes, it is, your Honor, and

19   I have examined it, and it matches the copy provided.

20             THE COURT:  Very good.  So, let's mark that

21   lease as Defendant's A in evidence.  It will be

22   Defendant's A in evidence.

23             Okay.  Now, as in the other case, my view

24   is that the burden then shifts to come over to the

25   plaintiff to say whether or not this lease

40
Proceedings

1    constitutes fair market value for the space that is

2    rented for the period of March 1st, '08, terminating

3    in March 1st, '09.

4               For the purposes of an appeal, do you want

5    your -- that in evidence, your downloaded internet

6    search as of December, 2011, which I would just deem

7    marked in this case again as Plaintiff's 1 for

8    identification, if you want that.  Do you want that

9    deemed marked?

10              MR. VIVERITO:  Yes.

11              THE COURT:  It's not coming into evidence

12   because it's a 2011 search.  Doesn't apply to the

13   period at issue.  And it is also rank hearsay in

14   terms of the quality or the admissibility of the

15   document itself.

16              And now we get to the issue of 95999.  Your

17   view, defendant, is that, correct me if I'm wrong, as

18   it was in the other cases we did today, that 95999

19   is -- if I read the medical fee schedule of the

20   Workers' Compensation fee schedule, I can see that

21   95999 relates to the nerve conduction amplitude

22   latency velocity study each nerve motor without F

23   wave studies.

24              MR. O'DONNELL:  Respectfully, your Honor --

25              THE COURT:  Pardon me.  Excuse me.  All

41

Proceedings

1   right.  Let's strike that.  95999 is unlisted

2   neurological or neuromuscular diagnostic procedure

3   and it's your view that even a layman such as myself

4   can find that this falls within the ambit of the --

5           MR. O'DONNELL:  Education Law.

6           THE COURT:  Did I get that back, the New

7   York State Education Law, section 6731?  And if I

8   read that statute in connection with section 238 of

9   the New York State Public Health Law, I find that

10  this is a procedure -- your argument is that I should

11  find that this is a procedure which is therefore

12  subject to section 238 of the Public Health Law and

13  so your view, Counsel, go ahead, and did I

14  accurately --

15          MR. O'DONNELL:  Yes, absolutely, your

16  Honor.

17          THE COURT:  Now, your view, Counsel, is,

18  and go ahead and tell me.

19          MR. VIVERITO:  Just briefly, your Honor,

20  that defendant hasn't properly demonstrated the

21  applicability of the statute to the set of facts of

22  this case, specifically, type of tests that were

23  performed.  I think that is, with all respect to your

24  decision, I think that an expert is required to

25  connect the definition of physical therapy to the

42

Proceedings

1    type of services performed in this case.  Our client

2    is not a physical therapist.  I don't know why there

3    could ever be an interpretation that he performs

4    physical therapy and that if defendant fails to make

5    that determination we don't even get to whether or

6    not we comport with the requirements of the statute.

7              Thank you, your Honor.

8              THE COURT:  Okay.  All right.  Well, I am

9    sticking with the theory of the other decisions that

10   I have made today, which is that 95999 does fall

11   within the category of procedures which are covered

12   by section 238 of the Public Health Law and therefore

13   the action is dismissed with prejudice, but without

14   prejudice for you to come forth to me within the next

15   30 days, if you want, Counsel, if there is an

16   affidavit that shows me that I have not made proper

17   interpretation, an affidavit of a medical

18   professional, a doctor, M.D., that says that that

19   does not constitute -- this 95999 does not constitute

20   a test of the -- get the right words again, of the --

21   I gave up my insurance law to you.  Where is the

22   insurance law?  Did you give that back to me, 6731?

23             MR. O'DONNELL:  I have extra copies of it.

24   You want the definition of physical therapy?

25             THE COURT:  Yes, because I have to

43

Proceedings

1    reference it here.  Okay.  So, if you have a medical

2    professional that defines -- that says that with

3    respect to the procedure 95999 that that is not to

4    test for the performance and they're not interpretive

5    tests and measurements to assess the

6    pathophysiological and pathomechanical and

7    developmental deficits of the human system in order

8    to determine treatment, well, then I will reconsider,

9    but I will probably just open the trial again for the

10   defendant to come forth with their expert and then

11   for to you bring in your expert.  But that would be

12   the sole extent to what I would do if you come forth

13   with a -- not a non conclusory, okay, affidavit,

14   which fully explains what those tests are and why

15   they do not test and measure pathophysiological and

16   pathomechanical deficits.

17            MR. VIVERITO:  Now, it must be an M.D. even

18   though our client is a D.C.?

19            THE COURT:  No, I think that would be okay.

20   If they can perform those tests, then a Doctor of

21   Chiropractic, you're right, can then put forth -- and

22   make sure it's an affidavit, not an affirmation, an

23   affidavit that says why it is, that this is not a

24   test that measures the pathophysiological and

25   pathomechanical deficits, if someone will sign that.

EXHIBIT 11

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: PART 41
------------------------------------------------------------x
DR. STEPHEN MATRANGOLO, D.C., P.C. a/a/o
David Fitzhugh,

                    Plaintiff,

       - against -

PROGRESSIVE CASUALTY INS. COMPANY,
                  Defendant.
------------------------------------------------------------x
Arthur F. Engoron, Judge

Index Number: 52599/09

<u>Decision and Order</u>

In compliance with CPLR 2219(a), this Court states that the following papers, numbered 1 to 3, were used on this motion by defendant for summary judgment and other relief:

<u>Papers Numbered:</u>

Moving Papers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Opposition Papers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Reply Papers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Upon the foregoing papers, the instant motion is granted.

<u>Background</u>
Public Health Law § 238-a(1), as effective December 8, 2002, provides that "[a] practitioner authorized to order . . . physical therapy services . . . may not make a referral for such services to a health care provider . . . where such practitioner . . . has a financial relationship with such health care provider." This statute does not cover the following (§ 238-a(5)(b)(I)):

        payments made for the rental or lease of office space, if (A) there is a written agreement, signed by the parties, for the rental or lease of the space, which agreement specifies the space covered by the agreement . . . provides for a term of rental or lease of at least one year, provides for a payment on a periodic basis of an amount that is consistent with fair market value, provides for an amount of aggregate payments that does not vary, directly or indirectly, based on the volume or value of any referrals of business between the parties, and would be considered to be commercially reasonable even if no referrals were made between the parties.

In the instant case, plaintiff has admitted that he rents professional space from the physician(s) who made the subject referrals. In particular, at a 3/12/07 deposition (Moving Exh. 6), plaintiff testified (at pp. 11-13) that he regularly performers services outside of his home office, that he leases space from the referring doctors, that he has written leases, that they are yearly, that the rental amount is

Page 1 of 2

not contingent on the number of referrals, that the leases indicate the rental amount, and that the rental amount is fair market value.

Discussion

This Court believes that Public Health Law § 238-a has an obvious and salutary purpose: to prevent the provision of health care from being based on financial incentive rather than patient welfare and medical necessity. The instant case implicates this issue, as plaintiff rents space from his referring physicians. Plaintiff claims that he falls within the statute's clearly-delineated "safe harbor." However, in opposition to the instant motion, he has failed (one might say "refused") to produce the best evidence, evidence within his possession, on that issue.

At oral argument plaintiff contended that the burden is on defendant to prove that he has run afoul of the Public Health Law. On a formal level, this Court believes that defendant has made out a prima facie case of a violation, because of the rental, and that the burden has shifted to plaintiff to prove inclusion within the safe harbor. On a less formal level, this Court does not believe in "ha ha, gotcha" litigation; if plaintiff seeks to rely on his written leases, let him provide them. As he has chosen not to do so, and as a violation of the statute is a complete bar to payment, whether or not the subject of a denial, plaintiff is not entitled to reimbursement; defendant is entitled to summary judgment dismissing the instant action; and the clerk is hereby directed to enter judgment accordingly.

Dated:    December 1, 2010

_____
Arthur F. Engoron, J.C.C.

EXHIBIT 12

American Arbitration Association
New York No-Fault Arbitration Tribunal

3750X

In the Matter of the Arbitration between:

| | | |
|---|---|---|
| Optimum Chiropractic Health, P.C. / David Rosario (Applicant) | AAA Case No. AAA Assessment No. Applicant's File No. | 412011075977 17 991 4292611 |
| - and - | | |
| Geico Insurance Company (Respondent) | Insurer's Claim File No. | 0252538730101023 |

## ARBITRATION AWARD

I, Howard D. Jacob, Esq., the undersigned arbitrator, designated by the American Arbitration Association pursuant to the Rules for New York State No-Fault Arbitration, adopted pursuant to regulations promulgated by the Superintendent of Insurance, having been duly sworn, and having heard the proofs and allegations of the parties make the following **AWARD:**

Injured Person(s) hereinafter referred to as:Eligible Injured Person

1. Hearing(s) held on
   ☒02/02/12
   and declared closed by the arbitrator on 3/6/12.

   Lee Odierno, Esq. participated in person for the Applicant.
   Law Offices of Short & Billy, by Mark Puleo participated in person for the Respondent.

2. The amount claimed in the Arbitration Request, **$1,310.94**, was NOT AMENDED at the oral hearing.

   STIPULATIONS were not made by the parties regarding the issues to be determined.

3. Summary of Issues in Dispute

   The issue in this arbitration is the Applicant's unpaid bill for electrodiagnostic testing. The Respondent raised a Section 238-a defense.

4. Findings, Conclusions, and Basis Therefor

The Applicant brought this arbitration proceeding to obtain payment of $1,310.94 for upper extremity pf-NCS testing done on March 16, 2010. The conciliation submissions of both parties were made part of the record, as well as their post-hearing briefs.

1

The Respondent raised a prohibited referral defense based on Section 238-a.  Section 238-a(1)(a) reads as follows:

> A practitioner authorized to order clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services, may not make a referral for such services to a health care provider authorized to provide such services where such practitioner or immediate family member of such practitioner has a financial relationship with such health care provider.

Section 238-a(1)(b) reads as follows:

> A health care provider or a referring practitioner may not present or cause to be presented to any individual or third-party payor or other entity a claim, bill, or other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services furnished pursuant to a referral prohibited by this subdivision.

The health insurance claim form indicates that Dr. Michael Genco was the referring provider and the testing took place at his facility.

On July 29, 2010, Dr. Christine Antoldi, the owner of Optimum Chiropractic Health, P.C., testified at an EUO.  The pertinent part of her testimony reads as follows:

Q.    Where do you do the test?
A.    In doctor's offices.
Q.    Do you do any in your own office?
A.    I do.
Q.    What percent do you do in your office?
A.    I want to say two percent.
Q.    So most of them are done in someone else's offices; correct?
A.    Yes.
Q.    How many different offices do you use?
A.    I use –right now there are three different offices.  There used to be two others but I am not currently testing in those offices.
Q.    Which two did you stop testing in?
A.    Dr. Whyte and Dr. Macagnone.
       In Dr. Macagnone's office I am not testing right now but I rent space there and it's just been very, very quiet.
Q.    So there haven't been enough referrals; correct?
A.    Anywhere.
Q.    Do you have a lease agreement with each of these offices?
A.    I do not.
       MR. EISENBERG:  Do you mean in writing or a verbal agreement?
       MR. SHORT:  Either.

A.    In verbal, yes.
Q.    Do you have a written agreement?

A.    No.
Q.    Have you ever had a written agreement for any of these offices?
A.    No.
Q.    What is the substance of the oral agreements?
A.    The substance is I pay a monthly fee to rent space in the office.
Q.    How much are the fees?
A.    It's different in the offices.
Q.    How much for each office?
A.    Dr. Wright is $600 per month and Dr. Picard is $800 per month.
Q.    Anyone else?
A.    Well, Dr. Macagnone was $400 per month.
Q.    Does Dr. Genco make referrals?
A.    He does.
Q.    How much is he a month?
A.    Him it's different.  We are in the same office. I don't pay him rent to do
      the testing.
Q.    Do you have other financial transactions with him?
A.    I work as his employee right now.  I am an employee of his and eventually
      I would like to be his partner.  I am working towards being his partner.

Counsel for the Applicant argued in his brief as follows:

      The EUO testimony of Dr. Antoldi which is the entire basis of the
      Respondent's claim is absent any information or testimony that at the
      time the medical services were rendered, she was in violation of the Public
      Health Law. The Respondent had ample opportunity to ask additional questions
      or request information but failed to so; their allegations based upon the responses
      to their limited questions are merely assumptions and are not
      substantiated facts.

Counsel also cited 10 NYCRR 34-1.7 that provides for exceptions to compensation arrangement
prohibitions.  Section 34-1.7(b) reads as follows:

      The following shall not be considered to be compensation arrangements
      subject to Public Health Law section 238-a(1)(a) or to Section 34-1.3 of
      this Subpart:
      (b) bona fide employment relationships: Any amount paid by an employer
      to a physician (or an immediate family member of such physician) who
      has a bona fide employment relationship with the employer for the
      provision of services, if:
      (1) the employment is for identifiable services;
      (2) the amount of the remuneration under the employment
      (i) is consistent with fair market value of the services; and
      (ii) is not determined in a manner that takes into account (directly or
      indirectly) the volume or value of any referrals by the referring physician;
      and
      (3) the remuneration is provided pursuant to an agreement which would
      be commercially reasonable even if no referrals were made to the
      employer. Subparagraph (2)(ii) shall not prohibit the payment of

3

remuneration in the form of a productivity bonus based on services performed personally by the physician (or an immediate family member of such physician).

Counsel for the Respondent argued as follows in his brief:

> Nowhere in her testimony does she indicate that Dr. Antoldi's or Optimum's business relationship with Dr. Genco was any different at any point in time, even though the 3-16-10 bill regarding services for the assignor was marked as an exhibit at the 7-29-10 EUO (see copy of that EUO exhibit herein as exhibit "E"). Dr. Antoldi never testified or claimed that she was not an employee of Dr. Genco when the 3-16-10 test was administered to the assignor. Applicant's belated attempt to deny the employment status of Dr. Antoldi has no factual basis, since Applicant never submitted any rebuttal affidavit from Dr. Antoldi on this issue despite having GEICO's submission for several months before the February 2, 2012 hearing before Arbitrator Jacob.

I have considered the arguments of counsel. I find that it was implicit in Dr. Antoldi's testimony that she was an employee of Dr. Genco on the date that the testing was done. If it were otherwise, the Applicant could have testified at this arbitration hearing or submitted an affidavit to that effect. Absent any evidence from the Applicant on this issue, I draw a negative inference. As to the exception raised by the Applicant's counsel under 10 NYCRR 34-1.7, I find that the burden of proof on the exception would rest with the Applicant. No evidence was submitted by the Applicant on this issue either. The Section 238-a defense is sustained.

**5.** Optional imposition of administrative costs on Applicant.
Applicable for arbitration requests filed on and after March 1, 2002.

I do NOT impose the administrative costs of arbitration to the applicant, in the amount established for the current calendar year by the Designated Organization.

Accordingly, the claim is DENIED in its entirety.

This award is in full settlement of all no-fault benefit claims submitted to this arbitrator.

State of New York
SS :
County of Nassau.

I, Howard D. Jacob, Esq., do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my award.

3/20/12
(Dated)

(Howard D. Jacob, Esq.)

## IMPORTANT NOTICE

*This award is payable within 30 calendar days of the date of transmittal of award to parties.*

*This award is final and binding unless modified or vacated by a master arbitrator. Insurance Department Regulation No. 68 (11 NYCRR 65-4.10) contains time limits and grounds upon which this award may be appealed to a master arbitrator. An appeal to a master arbitrator must be made within 21 days after the mailing of this award. All insurers have copies of the regulation. Applicants may obtain a copy from the Insurance Department.*

American Arbitration Association
New York No-Fault Arbitration Tribunal

374 67

In the Matter of the Arbitration between:

| | | |
|---|---|---|
| Optimum Chiropractic Health, P.C. / James Montelone (Applicant) | AAA Case No. AAA Assessment No. Applicant's File No. | 412011076104 17 991 4296411 |
| - and - | | |
| Geico Insurance Company (Respondent) | Insurer's Claim File No. | 0175691480101026 |

## ARBITRATION AWARD

I, Howard D. Jacob, Esq., the undersigned arbitrator, designated by the American Arbitration Association pursuant to the Rules for New York State No-Fault Arbitration, adopted pursuant to regulations promulgated by the Superintendent of Insurance, having been duly sworn, and having heard the proofs and allegations of the parties make the following **AWARD**:

Injured Person(s) hereinafter referred to as: Eligible Injured Person

1. Hearing(s) held on
   ☒ 02/02/12
   and declared closed by the arbitrator on 3/6/12.

   Lee Odierno, Esq. participated in person for the Applicant.
   Law Offices of Short & Billy, by Mark Puleo participated in person for the Respondent.

2. The amount claimed in the Arbitration Request, **$2,330.56**, was NOT AMENDED at the oral hearing.

   STIPULATIONS were not made by the parties regarding the issues to be determined.

3. Summary of Issues in Dispute

   The issues in this arbitration are the Applicant's unpaid bills for electrodiagnostic testing, denied based on an IME. In addition, the Respondent raised a prohibited referral defense based on Section 238-a of the Public Health Law.

4. Findings, Conclusions, and Basis Therefor

The Applicant brought this arbitration proceeding to obtain payment of $2,330.56 for upper extremity pf-NCS testing done on March 24, 2010 and lower extremity pf-NCS testing done on April 21, 2010. The conciliation submissions of both parties were made part of the record, as well as their post-hearing briefs.

1

The Respondent raised a prohibited referral defense based on Section 238-a of the Public Health Law.  Section 238-a(1)(a) reads as follows:

> A practitioner authorized to order clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services, may not make a referral for such services to a health care provider authorized to provide such services where such practitioner or immediate family member of such practitioner has a financial relationship with such health care provider.

Section 238-a(1)(b) reads as follows:

> A health care provider or a referring practitioner may not present or cause to be presented to any individual or third-party payor or other entity a claim, bill, or other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services furnished pursuant to a referral prohibited by this subdivision.

The health insurance claim forms indicate that the referring provider was Dr. Steven Macagone and the testing took place at his facility.

On July 29, 2010, Dr. Christine Antoldi, the owner of Optimum Chiropractic Health, P.C., testified at an EUO.  The pertinent part of her testimony reads as follows:

Q.    Where do you do the test?
A.    In doctor's offices.
Q.    Do you do any in your own office?
A.    I do.
Q.    What percent do you do in your office?
A.    I want to say two percent.
Q.    So most of them are done in someone else's offices; correct?
A.    Yes.
Q.    How many different offices do you use?
A.    I use –right now there are three different offices.  There used to be two others but I am not currently testing in those offices.
Q.    Which two did you stop testing in?
A.    Dr. Whyte and Dr. Macagnone.
      In Dr. Macagnone's office I am not testing right now but I rent space there and it's just been very, very quiet.
Q.    So there haven't been enough referrals; correct?
A.    Anywhere.
Q.    Do you have a lease agreement with each of these offices?
A.    I do not.
      MR. EISENBERG:  Do you mean in writing or a verbal agreement?
      MR. SHORT:  Either.

A.    In verbal, yes.

2

Q.    Do you have a written agreement?
A.    No.
Q.    Have you ever had a written agreement for any of these offices?
A.    No.
Q.    What is the substance of the oral agreements?
A.    The substance is I pay a monthly fee to rent space in the office.
Q.    How much are the fees?
A.    It's different in the offices.
Q.    How much for each office?
A.    Dr. Wright is $600 per month and Dr. Picard is $800 per month.
Q.    Anyone else?
A.    Well, Dr. Macagnone was $400 per month.
Q.    Does Dr. Genco make referrals?
A.    He does.
Q.    How much is he a month?
A.    Him it's different.  We are in the same office. I don't pay him rent to do the testing.
Q.    Do you have other financial transactions with him?
A.    I work as his employee right now.  I am an employee of his and eventually I would like to be his partner.  I am working towards being his partner.

Counsel for the Applicant argued in his brief as follows:

> The EUO testimony of Dr. Antoldi which is the entire basis of the Respondent's claim is absent any information or testimony that at the time the medical services were rendered, she was in violation of the Public Health Law.  There is no indication that at the time the medical services were rendered, she was renting space from another medical provider.  The Respondent had ample opportunity to ask additional questions or request information but failed to so; their allegations based upon the responses to their limited questions are merely assumptions and are not substantiated facts.

Counsel for the Respondent argued as follows:

> Nowhere in her testimony does she indicate that Optimum's business relationship with Dr. Macagnone was any different at any point in time.  This testimony conclusively establishes that Optimum had a financial relationship with Dr. Macagnone during the time Optimum got referrals from Dr. Macagnone which included the 3-24-10 and 4-21-10 dates of service for the bills at issue.

Having considered the arguments of counsel, I find that it is implicit in Dr. Antoldi's testimony that this was her relationship with Dr. Macagnone at the time the services were rendered.  If it were otherwise, the Applicant could have testified at this arbitration hearing or submitted an affidavit to that effect.  Absent any evidence from the Applicant on this issue, I draw a negative inference.  The Section 238-a defense is sustained.

3

**5.** Optional imposition of administrative costs on Applicant.
Applicable for arbitration requests filed on and after March 1, 2002.

I do NOT impose  the administrative costs of arbitration to the applicant, in the amount established for the current calendar year by the Designated Organization.

Accordingly, the claim is DENIED in its entirety.

This award is in full settlement of all no-fault benefit claims submitted to this arbitrator.

State of New York
SS :
County of Nassau.

I, Howard D. Jacob, Esq., do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my award.

3/20/12
(Dated)

(Howard D. Jacob, Esq.)

IMPORTANT NOTICE

*This award is payable within 30 calendar days of the date of transmittal of award to parties.*

*This award is final and binding unless modified or vacated by a master arbitrator. Insurance Department Regulation No. 68 (11 NYCRR 65-4.10) contains time limits and grounds upon which this award may be appealed to a master arbitrator. An appeal to a master arbitrator must be made within 21 days after the mailing of this award. All insurers have copies of the regulation. Applicants may obtain a copy from the Insurance Department.*

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

CAMBRIDGE MEDICAL, P.C.,

Case No:
2:11-cv-04044-LDW-ETB

Plaintiff,

-against-

ALLSTATE INSURANCE COMPANY, et al.

Defendant,

-----------------------------------------------------------------X

ALLSTATE INSURANCE COMPANY, et al.

Defendants and Third Party Plaintiffs

-against-

PINE HOLLOW MEDICAL, P.C., et al.,

Third Party Defendants.

-----------------------------------------------------------------X

**DEFENDANTS' AND THIRD PARTY PLAINTIFFS' ATTORNEY'S
AFFIRMATION IN OPPOSITION TO PLAINTIFF AND THIRD-PARTY
DEFENDANTS' MOTION TO DISMISS**

SHORT & BILLY, P.C.
Attorneys for Defendants and Third-Party Plaintiffs
ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY and
ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,
217 Broadway, Suite 300
New York, N.Y. 10007
(212) 732-3320
rroonan@shortandbilly.com